232 P.3d 1118 (2010)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Terry J. PRESZLER, an Attorney at Law.
No. 200,570-5.
Supreme Court of Washington, En Banc.
Argued February 24, 2009.
Decided June 17, 2010.
*1121 Kurt M. Bulmer, Attorney at Law, Seattle, WA, for Petitioner.
Joanne S. Abelson, Washington State Bar Assc., Seattle, WA, for Respondent.
FAIRHURST, J.
¶ 1 Terry J. Preszler appeals the Washington State Bar Association (WSBA) Disciplinary Board (Board) recommendation to suspend him for three years from the practice of law. Preszler charged an unreasonable fee, gave mistaken legal advice, filed false documents with a tribunal, failed to supervise his paralegal, and did not obtain the requisite approval of the bankruptcy court before distributing proceeds from his client's personal injury claim to himself. Based on this misconduct, the hearing officer and the Board found Preszler violated six Rules of Professional Conduct (RPC). Preszler does not argue he did nothing wrong. Rather, he claims the hearing officer and the Board erred by finding that Preszler committed conduct prejudicial to the administration of justice based on a single instance of impropriety. Preszler also argues they should have merged two of the charged counts of misconduct. Mostly, though, Preszler contends the Board improperly applied the sanctions analysis. He argues he did not act knowingly, did not cause a serious actual or potential injury, and is entitled to mitigation of the presumptive sanction. Rejecting most of Preszler's arguments, we impose the Board's recommended sanction of a three year suspension.

I. FACTUAL BACKGROUND
¶ 2 On December 19, 2000, Kinnie Gerrard and Jeffery Gerrard hired Preszler to represent them in a chapter 13 bankruptcy. In 2000, Preszler had 15 years of experience working on personal bankruptcy cases. The Gerrards told Preszler that Kinnie[1] had an unresolved prebankruptcy personal injury claim stemming from a car crash that happened on September 6, 2000. Although Preszler did not learn the details of the personal injury claim or its value, he listed the claim as an asset of the bankruptcy estate with a "current value" of $16,150 when he filed the Gerrards' chapter 13 bankruptcy on April 4, 2001. Decision Papers (DP) at 7, ¶ 4; Ex. 16. Preszler knew that 11 U.S.C. § 522(d)(11)(D) permitted an individual debtor to claim an exemption of up to $16,150 for certain personal injuries. DP at 7, ¶ 4; Ex. 16. On October 12, 2001, the United States Bankruptcy Court for the Eastern District of Washington entered an order confirming the Gerrards' chapter 13 plana base of $13,743.88 with monthly payments for 58 months. At this time, Preszler did not represent Kinnie in her personal injury claim.
¶ 3 By August 18, 2003, Kinnie had yet to settle her personal injury claim, so she and her husband met with Preszler. Kinnie was concerned because the statute of limitations for the claim would run on September 6, *1122 2003. Preszler told the Gerrards that he thought the claim was worth about $53,000, which Kinnie said she would accept. Preszler said that due to the statute of limitations, he was not interested in handling the case, but, as a courtesy, he called the Allstate insurance adjuster handling the claim. Both Preszler and the Gerrards understood that Preszler would not receive a fee for his help. Preszler said Kinnie would settle for $53,000. The adjuster said she could not settle for that amount without additional medical information, but if Kinnie could provide the records, the adjuster would reevaluate the claim. The adjuster did not believe that Preszler represented Kinnie. Preszler instructed Kinnie to obtain and deliver the necessary records to the adjuster, but Preszler reiterated that he did not want to take the case.
¶ 4 The Gerrards met with Preszler the next day, August 19, 2003. Jeffery wanted to hire Preszler for the personal injury claim, but because Kinnie's brother-in-law had died the day before and Kinnie was emotional, Preszler told Kinnie that she should not decide that day, and she did not hire Preszler.
¶ 5 On August 20, 2003, Kinnie saw her doctor and asked that he fax the requested medical records to the adjuster. On August 21, 2003, Kinnie called the adjuster to discuss Kinnie's claim. At Kinnie's request, the adjuster sent a letter outlining their conversation to Preszler. Preszler received and reviewed it.
¶ 6 On August 22, 2003, the adjuster called Kinnie and told her that she received the needed medical information. The adjuster offered policy limits of $50,000 to Kinnie, $19,000 of which would reimburse State Farm Insurance for personal injury protection benefits, and the remaining $31,000 would go to Kinnie. To accept the offer, Kinnie had to sign a release of claims against Allstate's insured. At Kinnie's request, the adjuster faxed the settlement paperwork to Preszler. Preszler received the release and the adjuster's letter confirming the settlement offer.
¶ 7 Kinnie arranged an appointment with Preszler for that same day, August 22, 2003, where they discussed the settlement paperwork. Preszler explained that he could ask for the personal injury exemption in the bankruptcy plan to be increased from $16,150 to $17,425, but the remainder of the settlement proceeds would go to the Gerrards' creditors in the bankruptcy. Actually, Preszler could have exempted almost $10,000 more of the personal injury recovery proceeds under the "Wild Card" exemption in 11 U.S.C. § 522(d)(5).
¶ 8 At the August 22, 2003, meeting, Kinnie and Preszler signed a contingency fee agreement, which was backdated to August 18, 2003. The agreement provided that Preszler would receive one-third of the remaining $31,000. Kinnie asked whether she would in fact receive $17,425. Preszler promised she would and handwrote a guarantee to that effect on the fee agreement.
¶ 9 Preszler sent the settlement paperwork to the adjuster and requested a settlement check payable to Kinnie and Preszler. Preszler's office received the check on August, 27, 2003, and deposited the money as a credit to Kinnie in Preszler's trust account. Preszler instructed his paralegal to contact the trustee of the Gerrard bankruptcy estate to determine the process for disbursing the funds to himself. Based on the directions from the trustee's employee, Preszler's paralegal drafted an application for an order approving Preszler's appointment as an attorney for the trustee in the personal injury claim.[2] Preszler had not used such an application, and he asked his paralegal if the trustee wanted the application. The trustee confirmed he did. Preszler signed the application without reading it thoroughly or fully grasping its meaning. The application provided that Preszler (1) is a fiduciary to the Gerrard bankruptcy estate, (2) represents under penalty of perjury that "the case needs an attorney to settle," (3) will render services to "settle with Allstate Insurance the personal injury claim," (4) will be paid pursuant to the contingent fee agreement executed by Kinnie, (5) will take payment under the contingent *1123 fee agreement "in accordance with 11 U.S.C. [§§] 329 and 330 and [Fed. R. Bank. P.] 2016," which require approval by the bankruptcy judge prior to the time payment is disbursed, and (6) has read the application materials and verifies "that they are true and accurate and that they disclose all material facts required to the best of my knowledge and belief." Ex. 11. When the trustee received the application, he did not know that Kinnie's claim had already been settled.
¶ 10 Preszler prepared and reviewed amended bankruptcy schedules. Even though he had the settlement in hand, he left blank a box in schedule B reserved for designating the current market value of Kinnie's personal injury claim. Schedule C claimed that $17,425 of the proceeds from the car accident claim was exempt from creditors, but he wrote "[u]nknown" in the schedule C space for listing the current market value of the car accident claim. The Gerrards signed the amended schedule on August 29, 2003. After reviewing the amended schedules, the trustee inquired further and learned about the settlement with Allstate. The trustee also discovered that while the contingency fee agreement bore the date of August 18, 2003, it actually had been signed on August 22, 2003. The trustee had concerns but did not pursue them.
¶ 11 On September 3, 2003, the trustee's employee told Preszler's paralegal that the trustee signed the application but could not file it until the Gerrards agreed to commit nonexempt proceeds from Kinnie's personal injury claim to funding the bankruptcy plan. Preszler signed and filed a stipulation agreeing to commit the nonexempt proceeds to funding the plan. Preszler's paralegal prepared an order approving employment, which Preszler signed. That order stated that Preszler was employed "with regards to an ongoing personal injury case" and "to continue the personal injury case in order to obtain a resolution and settlement." Ex. 15. The order mandated that compensation accord with the federal statutes and bankruptcy court rules requiring Preszler to request court approval to disburse before doing so. Preszler signed the order, as did the bankruptcy judge.
¶ 12 On September 15 and 16, 2003, without first obtaining a court order, Preszler disbursed $10,323 to himself from the Gerrards' trust account. Preszler did not prepare a settlement statement, nor did he disclose the disbursement to the Gerrards, the trustee, or the bankruptcy court.
¶ 13 After talking to Preszler's paralegal in late September, Kinnie learned that she might have been able to use more of the settlement payment to reduce the term of her chapter 13 bankruptcy plan. Kinnie hired Bill Hames, a bankruptcy attorney. Hames called Preszler to tell him that Preszler had failed to utilize the wild card exemption. He tried to convince Preszler to waive his fee so that Hames could amend the exemptions to provide the Gerrards an additional $9,650 of the personal injury claim recovery. Hames also indicated that the rest of the settlement could be used to reduce the term of the Gerrards' plan. Hames told Preszler that he was not entitled to the contingent fee because the case had settled prior to the execution of the agreement.
¶ 14 In a letter, Hames demanded that Preszler pay the Gerrards "all money received from Allstate Insurance Company" less sums Preszler already had paid to the Gerrards. Ex. 19. Hames demanded an itemization "as to the amount of money that was actually received, how much has been paid to them, and a check for the difference." Id. Hames offered to have the Gerrards sign a release of all claims against Preszler.
¶ 15 Preszler reimbursed his trust account with the contingent fee he had taken. He complied with Hames' other demands, but the itemization did not include the portion of his client ledger related to his disbursement to himself or the replacement of the funds back to the trust account. Preszler and the Gerrards signed the release. Hames filed a new amended schedule that included an exemption of an additional $9,650 of the personal injury claim proceeds and that applied $2,925 of the remaining proceeds to reduce the number of payments to creditors.[3]

*1124 II. PROCEDURAL HISTORY
¶ 16 On April 26, 2005, the WSBA filed an amended complaint with the Board charging Preszler with 17 counts of misconduct. A hearing was held in May 2005. On March 29, 2006, the Board remanded the matter to a new hearing officer because the original hearing officer had taken into consideration his personal knowledge of Preszler and evidence outside the record. Following the hearing on April 16-20, 2007, the hearing officer found a clear preponderance of the evidence supported the following counts:[4]
 Count 1: violation of former RPC 1.5(a) (1990)
 Count 3: violation of former RPC 1.4(b) (1985)
 Count 14: violation of former RPC 3.4(c) (1985) and 8.4(d) (2002)
 Count 15: violation of former RPC 8.4(d)
 Count 17: violation of former RPC 5.3(b) and (c)(1) (1985)
¶ 17 The hearing officer determined the presumptive sanction to be disbarment. He found the aggravating factor of substantial experience in the practice of law and mitigating factors of (1) absence of a prior disciplinary record, (2) timely good faith effort to make restitution or to rectify consequences of misconduct, (3) full and free disclosure to the Board and cooperative attitude toward proceedings, (4) character and reputation, and (5) delay in disciplinary proceedings. He balanced the aggravating and mitigating factors and recommended that Preszler be suspended from the practice of law for 30 days.
¶ 18 The Board viewed some of the mitigating factors differently. The Board determined that delay was not a mitigating factor because the delay did not prejudice Preszler. The Board concluded that the mitigator of timely good faith effort to make restitution applied but carried little weight because Preszler required Kinnie to sign a release to get her money back. By a vote of 9-to-2, the Board increased the recommended sanction to a three year suspension, with the dissenting members arguing a sanction of disbarment was appropriate. We granted Preszler's request for review of the Board's recommendation.

III. ISSUES
A. Did the hearing officer and the Board err by finding a violation of former RPC 8.4(d), conduct prejudicial to the administration of justice, for a single instance of impropriety in failing to follow a court rule?
B. Should counts 14 and 15 merge?
C. Did the Board properly conclude that a three year suspension was the appropriate sanction for Preszler?

IV. ANALYSIS
¶ 19 The responsibility for disciplining Washington lawyers ultimately rests with this court. In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 329, 157 P.3d 859 (2007). Preszler does not contest the findings that he violated former RPC 1.5(a) in count 1, former RPC 1.4(b) in count 3, former RPC 3.4(c) in count 14, and former RPC 5.3(b) and (c)(1) in count 17. These findings are verities on appeal. See, e.g., In re Disciplinary Proceeding Against Longacre, 155 Wash.2d 723, 735, 122 P.3d 710 (2005). Preszler does argue, however, that (A) a violation of former RPC 8.4(d) cannot be based on a single act, (B) counts 14 and 15 should merge, and (C) the Board's recommended sanction is too harsh because (1) his mental state was less culpable than the hearing officer found, (2) the injury he caused was not as serious as the hearing officer found in some instances, and (3) the aggravating and mitigating factors as well as prior attorney discipline cases with similar facts do not support the recommended sanction.

*1125 A. Did the hearing officer and the Board err by finding a violation of former RPC 8.4(d), conduct prejudicial to the administration of justice, for a single instance of impropriety in failing to follow a court rule?
¶ 20 Former RPC 8.4(d) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct that is prejudicial to the administration of justice." The hearing officer found that Preszler violated this rule, as the WSBA charged in counts 14 and 15. Preszler argues that because he did not engage in a pattern of misconduct, this finding is error. This is a legal question, which we review de novo.
¶ 21 Preszler relies on language from the slip opinion for In re Disciplinary Proceeding Against Carmick, "the conduct prohibited by [former] RPC 8.4(d) is more often associated with moral turpitude, obvious bias, or a persistent pattern of misconduct indicating disregard for the practice of law.... A single instance of impropriety in obtaining an ex parte order does not demonstrate a pattern of misconduct." Opening Br. of Resp't Preszler at 26 (emphasis added) (quoting In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 48 P.3d 311 (Wash. 2002)). But in a subsequent order we amended the opinion's language, which now reads, "the conduct prohibited by [former] RPC 8.4(d) is more often associated with physical interference in the administration of justice or the violation of practice norms." In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 597, 48 P.3d 311 (2002). As amended, Carmick does not support Preszler's position.
¶ 22 Before and after Carmick, we have found violations of former RPC 8.4(d) absent a pattern of misconduct. In In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 256, 66 P.3d 1057 (2003), we found a violation of former RPC 8.4(d) based on the lawyer's causing a forged deed to be recorded. In In re Disciplinary Proceedings Against Bonet, 144 Wash.2d 502, 514, 29 P.3d 1242 (2001), we found a violation based on a prosecutor's offer of inducement to a witness not to appear at trial. Guided by these cases and our amendment in Carmick, we conclude a single act of impropriety can violate former RPC 8.4(d). The hearing officer did not have to find that Preszler engaged in a pattern of misconduct and did not err by finding that Preszler violated former RPC 8.4(d).

B. Should counts 14 and 15 merge?
¶ 23 Preszler argues that counts 14 and 15 should merge because "they deal with the same conduct and the same rule[former] RPC 8.4(d)." Opening Br. of Resp't Preszler at 27. The hearing officer's written findings for count 14 said, "By disbursing to himself from his trust account a portion of the personal-injury proceeds, Mr. Preszler knowingly disobeyed obligations under the bankruptcy rules in violation of [former] RPC 3.4(c) and engaged in conduct that is prejudicial to the administration of justice in violation of [former] RPC 8.4(d)." DP at 32, ¶ 57. For count 15, the hearing officer found, "By disbursing the personal-injury proceeds to himself without the consent, knowledge, or authority of the bankruptcy Trustee and bankruptcy Court, Mr. Preszler knowingly violated bankruptcy rules with the intent to gain a benefit for himself." DP at 33, ¶ 58 (emphasis added).
¶ 24 The WSBA's complaint charged each count with different accompanying RPCs and different underlying misconduct. Count 14 alleged Preszler violated former RPC 3.4(c), 8.4(c), 8.4(d), and former 8.4(j)(2002) "[b]y disbursing the personal injury proceeds to himself without the consent, knowledge, or authority of the Bankruptcy Court and/or in violation of the Order Approving Employment." Clerk's Papers (CP) at 41; DP at 4 (emphasis added). Count 15 alleged Preszler violated former RPC 1.14(a) (2002), 8.4(c), and 8.4(d) "[b]y disbursing the personal injury proceeds to himself without the consent, knowledge, or authority of the bankruptcy trustee." CP at 41; DP at 4 (emphasis added).
¶ 25 Nevertheless, because the merger issue ultimately has no bearing on our final conclusion, we assume, without deciding, that the counts should be merged.

*1126 C. Did the Board properly conclude that a three year suspension was the appropriate sanction for Preszler?
¶ 26 We use a well established three-stage analysis to review the Board's recommended sanction for a violation of the RPCs. Using the American Bar Association's Standards for Imposing Lawyer Sanctions (1991 ed. & Supp. 1992), "[w]e first evaluate whether the Board properly determined the presumptive sanction by considering (1) the ethical duties violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's conduct." Marshall, 160 Wash.2d at 342, 157 P.3d 859."Where multiple instances of misconduct have occurred, the overall presumptive sanction should at least be consistent with the sanction for the most serious offense." Id. at 346, 157 P.3d 859. Second, we determine whether any aggravating or mitigating circumstances call for a departure from the presumptive sanction. Id. Third, we evaluate the Board's recommended sanction based on "(1) proportionality of the sanction to the misconduct and (2) the extent of agreement among the members of the Disciplinary Board." In re Disciplinary Proceeding Against Schwimmer, 153 Wash.2d 752, 764, 108 P.3d 761 (2005) (citing Kuvara, 149 Wash.2d at 259, 66 P.3d 1057). We reach this third step "only if the issue is raised by the attorney who is being disciplined." In re Disciplinary Proceeding Against Trejo, 163 Wash.2d 701, 734, 185 P.3d 1160 (2008). Where recommendations differ, we will generally give more weight to the Board's sanction recommendation than the hearing officer's, based on the Board's unique experience and perspective in the administration of sanctions. In re Disciplinary Proceeding Against Cohen, 150 Wash.2d 744, 754, 82 P.3d 224 (2004) (Cohen II).

1. Step 1: the presumptive sanction

(a) Count 1: violation of former RPC 1.5(a)

¶ 27 In count 1, the WSBA alleged that Preszler charged an unreasonable fee in violation of former RPC 1.5(a), which provides, "A lawyer's fee shall be reasonable." The hearing officer found the WSBA met its burden of proof, and Preszler does not dispute this finding.
¶ 28 Applying step one of our sanctions analysis, we begin with the nature of the duty violated. A violation of former RPC 1.5(a) is a breach of an ethical duty owed as a legal professional, and so the presumptive sanction is supplied by standard 7.0. The severity of the presumptive sanction depends on the lawyer's state of mind at the time of the conduct and the gravity of the harm caused:
7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.
7.3 Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.
7.4 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence that is a violation of a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.
ABA STANDARDS at 14.
¶ 29 The hearing officer found that "Preszler knowingly charged an unreasonable fee for the negligible amount of work he did in Mrs. Gerrard's personal injury claim" and that Preszler acted "[w]ith the intent of benefitting himself at the expense of creditors in the Gerrard bankruptcy." DP at 25, ¶ 51. The hearing officer concluded that standard 7.1 dictated a presumptive sanction of disbarment. The Board agreed that Preszler acted knowingly, but the Board found the record *1127 supported a finding of only an "injury or potential injury" to Kinnie, but not a "serious or potentially serious injury." DP at 39. The Board concluded standard 7.2 called for a presumptive sanction of suspension. Preszler argues that both the hearing officer and the Board are wrong and that the appropriate presumptive sanction for count 1 is reprimand or admonishment. Preszler claims that he did not know the fee was unreasonable, so at most he was negligent. Preszler does not challenge the finding that he caused an injury or potential injury, but the WSBA contends that the potential injury to Kinnie was serious and that the presumptive sanction is therefore disbarment.
¶ 30 The ABA Standards define "`[k]nowledge'" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA STANDARDS Definitions at 17. An attorney's knowledge may be inferred from the facts. See In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 611, 9 P.3d 193 (2000). "`Negligence'" is the "failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA STANDARDS Definitions at 17. An attorney's mental state "is a factual determination and the hearing officer's finding is given great weight." Longacre, 155 Wash.2d at 744, 122 P.3d 710. "[S]ometimes there is a fine line between negligence and knowledge." In re Disciplinary Proceeding Against Stansfield, 164 Wash.2d 108, 127, 187 P.3d 254 (2008). Because the hearing officer is in the best position to determine the attorney's state of mind, we defer to the hearing officer's findings unless it is not supported by substantial evidence. Longacre, 155 Wash.2d at 744, 122 P.3d 710.
¶ 31 Preszler claims he "did not knowingly seek to charge an unreasonable fee." Opening Br. of Resp't Preszler at 22. Preszler does not seriously argue that the fee was actually reasonable; rather, he cites several reasons for him having a good faith belief that the fee was reasonable. He says the Gerrards pressured him to take the case and treated him like their attorney, and he points out that he participated in the settlement process. He felt he was indemnifying the Gerrards by risking malpractice, and he contends the statute of limitations prevented further negotiations or inquiry into Kinnie's injuries. Finally, in his mind, the contingency fee agreement was illusory or informal because he knew that the bankruptcy trustee would have to agree to the fee.
¶ 32 But the issue is not whether Preszler's objective was to charge an unreasonable fee. Preszler confuses knowledge with intent. Unlike with intent, to act with knowledge, Preszler did not need to be acting with "the conscious objective or purpose to accomplish a particular result." ABA STANDARDS Definitions at 17. Standards 7.1 and 7.2 require only that "a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional." The knowledge element relates to the attorney's underlying conduct, not to the legal conclusion that the conduct is an ethical violation. As we said in In re Disciplinary Proceeding Against Egger, 152 Wash.2d 393, 416, 98 P.3d 477 (2004), "consciousness that particular conduct violates the RPCs is not a prerequisite for a finding of knowledge." To prove that Preszler acted with knowledge, the WSBA needed to show only that he had "the conscious awareness of the nature or attendant circumstances of [his] conduct." ABA STANDARDS Definitions at 17. Preszler's claim that he believed the fee was reasonable is irrelevant. We rejected this same argument in In re Disciplinary Proceeding Against Brothers, 149 Wash.2d 575, 585, 70 P.3d 940 (2003), where an attorney who collected an unreasonable contingency fee claimed that he did not know his fee would be unreasonable, and therefore he could not have acted with knowledge. Because "he knew that he had done very little legal work for a very large fee," we concluded he "was consciously aware of the nature of his conduct." Id. Preszler simply needed to be consciously aware of the circumstances that made his fee unreasonable.
¶ 33 Substantial evidence supports the hearing officer's finding that Preszler acted *1128 with knowledge. At the August 18, 2003, meeting, Preszler insisted that Kinnie sign an intake form in which she provided basic contact information, noted the date of the car crash, and acknowledged the disclaimer, stated in bold lettering above her signature, "I recognize that I am not a client until I sign a fee agreement and have paid a retainer." Ex. 1 (boldface type omitted). Preszler testified that at the August 19, 2003, follow-up meeting, he said to Kinnie, "I do not want to be involved with this case." Tr. at 830. Substantial evidence established that before August 22, 2003, the Gerrards, the adjuster, and Preszler all understood that Preszler's actions were courtesies and that Preszler volunteered to make phone calls and receive faxes without representing the Gerrards.
¶ 34 Preszler testified, however, that at the August 22, 2003, meeting, Kinnie wanted Preszler to represent her and that she came up with the idea that Preszler could be paid with a portion of the settlement that would otherwise go to the creditors. Kinnie offered testimony contradicting Preszler's, saying that it was Preszler who asked her to enter the contingency fee agreement and convinced her that he deserved the fee. Kinnie testified that she wanted to be sure the fee could not be used to assist with the Gerrards' bankruptcy plan and agreed to the fee only after consulting with her husband. The hearing officer observed all the witnesses and is the best judge of their veracity. Kinnie's testimony supports the officer's finding of knowledge. Further, the identity of the person who suggested the fee has no bearing on Preszler's knowledge of the nature of his conduct, because "a client's acquiescence to an unreasonable fee does not absolve misconduct." Egger, 152 Wash.2d at 407, 98 P.3d 477. Preszler acknowledges that he did very little work. He knew he was charging a one-third contingency fee for a case where no contingency existed. The case had already settled when Preszler handwrote a guarantee that Kinnie would receive $17,425. These facts provide substantial evidence to support the hearing officer's inference that Preszler was aware of the nature of his conduct and the circumstances.
¶ 35 Next, we consider the actual or potential injury suffered by Kinnie as a result of Preszler's violation of former RPC 1.5(a). The procedural record is unclear on this point. The hearing officer applied standard 7.1 to conclude the presumptive sanction is disbarment, but his findings do not expressly state that he thought the injury or potential injury was serious. The hearing officer stated only that Preszler's "action could have resulted in loss to the Gerrards if Mr. Hames had not intervened." DP at 25, ¶ 51. The Board found the record supported an ordinary actual "injury or potential injury" rather than a "serious" actual or potential injury. DP at 39. The WSBA argues the Board erred.
¶ 36 We conclude substantial evidence could support a finding of either ordinary or serious injury. On one hand, the evidence supports the Board's finding of ordinary actual or potential injury because the amount of money involved was not too high. On the other hand, evidence also supports the finding that Preszler's misconduct caused a serious actual or potential injury because Kinnie repeatedly asked Preszler if there was some way the money could be used in the bankruptcy plan and Preszler knew that the Gerrards were on a tight budget and in bankruptcy. Without a clear statement from the hearing officer, however, we are reluctant to find that the actual or potential injury was serious.
¶ 37 Because Preszler acted with knowledge and caused an ordinary actual or potential injury, we apply standard 7.2 and conclude suspension is the presumptive sanction for count 1.

(b) Counts 14 and 15: violations of former RPC 3.4(c) and 8.4(d)

¶ 38 For counts 14 and 15, the hearing officer found that Preszler violated former RPC 3.4(c) (stating that a lawyer must not "[k]nowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists") and 8.4(d) (defining professional misconduct to include "[e]ngag[ing] in conduct that is prejudicial to the administration of justice."). The hearing officer used *1129 standard 6.0 to determine the presumptive sanction:
6.21 Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding.
6.22 Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.
6.23 Reprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.
ABA STANDARDS at 13. The hearing officer concluded the presumptive sanction is disbarment, and the Board upheld his determination. Preszler does not argue that he acted without intent to obtain a benefit for himself; rather, he claims that his actions were negligent, not knowing, and that the actual or potential harm was not serious. Accordingly, Preszler believes that the presumptive sanction should be a reprimand. We disagree.
¶ 39 The knowledge analysis is slightly different than it was for count 1. Former RPC 3.4(c) itself contains a similar knowledge element, stating a violation occurs when a lawyer "[k]nowingly disobey[s] an obligation under the rules of a tribunal." Former RPC 8.4(d) does not include a mental state element, but standard 6.21 applies only if the attorney "knowingly violate[d] a court order or rule." Thus, to have violated former RPC 3.4(c) and to be subject to a presumptive sanction of disbarment, Preszler had to be consciously aware that his conduct violated a court order or rule.
¶ 40 After reviewing the record, we conclude that substantial evidence supports the hearing officer's finding that Preszler knew he could not remove the funds absent court approval. Preszler had worked on bankruptcy cases since 1985 or 1986. Preszler himself presented the bankruptcy court order approving Preszler's employment as Kinnie's personal injury attorney, and this order stated his compensation "shall be made in accordance" with the relevant federal statutes and court rules, which required approval by the bankruptcy judge prior to the time payment is disbursed. Ex. 15. The order also contained a declaration that Preszler had read the application materials and verified "that they are true and accurate and that they disclose all material facts required to the best of my knowledge and belief." Ex. 11. Preszler admitted that, as of August 2003, he knew he needed an order authorizing payment of compensation before he could get paid. In fact, Preszler had prepared such orders in several prior cases. Exs. 24-31.
¶ 41 Also, the hearing officer could infer that Preszler concealed his disbursement from the Gerrards because Preszler, contrary to his general practice, failed to prepare a contingent fee settlement statement. Similarly, because Preszler did not disclose to Hames a complete version of his client ledger, the hearing officer could infer that Preszler sought to conceal his actions from Hames. These inferences reflect Preszler's consciousness of guilt. The foregoing facts, when taken as a whole, constitute substantial evidence supporting the finding that Preszler acted knowingly.
¶ 42 Preszler argues that his actions related to counts 14 and 15 did not cause serious actual or potential injury because, when questioned by Hames, he immediately reimbursed the amounts. A "`[p]otential injury'" is defined as "the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards Definitions at 7. Preszler concedes that "if the true nature of the time spent on the case and the lack of risk were known to the trustee[,] he would not have approved the fee." Opening Br. of Resp't Preszler at 28-29. If not for Hames' intervention, *1130 the Gerrards' bankruptcy would have been harmed. This is a potential injury. And the underlying misconduct potentially injured multiple parties. In addition to the Gerrards, the evidence demonstrates that Preszler's failure to comply with the bankruptcy rules and laws deprived the trustee, the creditors, and the bankruptcy court the opportunity to review and determine whether the attorney fees were reasonable. Substantial evidence supports the hearing officer's determination that Preszler's actions caused serious actual or potential injury.
¶ 43 Because Preszler acted knowingly and caused a serious actual or potential injury, the hearing officer and the Board correctly determined that the presumptive sanction for counts 14 and 15, even if merged, is disbarment.[5]

2. Step two: aggravating and mitigating factors

¶ 44 Having determined the presumptive sanction is disbarment, we move to the second stage, in which we review the aggravating and mitigating factors.

(a) Unchallenged aggravating and mitigating factors

¶ 45 The parties do not challenge the aggravating factor of substantial experience in the practice of law and the mitigating factors of absence of prior disciplinary record and character and reputation.

(b) Challenged aggravating and mitigating factors

(1) Aggravating: multiple offenses

¶ 46 An aggravating factor is "multiple offenses." ABA STANDARDS std. 9.22(d). The hearing officer did not cite it, but the Board applied it because the hearing officer found five counts of ethical misconduct. DP at 40. Preszler argues we should give little, if any, weight to this aggravating factor, because counts 14 and 15 should merge, and Preszler's violations of former RPC 5.3(b) in count 17 was the only other serious violation.
¶ 47 The purpose of the aggravating factor of multiple offenses is to deter multiple violations of the RPCs. Preszler committed at least four separate counts of ethical misconduct. The presumptive sanction for counts 14 and 15, even if merged, is disbarment. The basis for counts 14 and 15 were violations of former RPC 3.4(c) and 8.4(d). Those violations and Preszler's other offenses charging an unreasonable fee (count 1), failing to explain the bankruptcy exemptions to Kinnie (count 3), and failing to supervise his paralegal (count 17)amount to multiple offenses. Preszler is correct that counts 3 and 17 carry a presumptive sanction of only admonition and reprimand, respectively. But even if less serious than Preszler's other misdeeds, they should not go uncounted. We agree with the Board that Preszler's multiple offenses deserve some weight as an aggravating factor.[6]

(2) Mitigating: restitution

¶ 48 A mitigating factor is "timely good faith effort to make restitution or to rectify consequences of misconduct." ABA STANDARDS std. 9.32(d). The Board concluded this mitigating factor "carries little weight," because Preszler "required his client to sign a release to get her own money back." DP at 40. Preszler, however, argues we should fully weigh this factor.
¶ 49 Restitution is in good faith if "made upon the lawyer's own initiative." ABA STANDARDS std. 9.3 cmt. at 50 (emphasis added). "Lawyers who make restitution voluntarily and on their own initiative demonstrate both a recognition of their ethical violation *1131 and their responsibility to the injured client or other party." Id. std. 9.4 cmt. at 51. A reduction in the sanction also acts as an incentive "to make restitution, reducing the degree of injury to the client and helping ensure that the lawyer has recognized the wrongfulness of his conduct." Id. std. 9.3 cmt. at 50.
¶ 50 In our view, consistent with the commentary to the ABA Standards, restitution is not in good faith when the lawyer's ethical misconduct was knowing and yet the lawyer pays restitution only when a client demands it. In that circumstance, the lawyer is not acting on his or her own initiative, but at the client's behest, and is acting in fear of punishment, not out of an earnest desire to remedy the damage and admit liability. A different notion of good faith would give an incentive to culpable lawyers to withhold restitution until they are caught. Rather than admitting they have done wrong and remedying the harm, they are better off risking that no one notices their misconduct. If they are caught, they would still get full mitigation credit for paying restitution. That cannot be good faith.[7]
¶ 51 We implicitly recognized this interpretation of good faith restitution in Schwimmer. In Schwimmer, attorney Alec M. Schwimmer withdrew over $2,500 of his client's money from his trust account without his client's permission. 153 Wash.2d at 759, 108 P.3d 761. Schwimmer returned the money after his client demanded reimbursement. Id. The hearing officer had found "a timely good faith effort to rectify the consequences of his misconduct by reimbursing his client," id. at 756, 108 P.3d 761, but we held firmly that there were "no extraordinary mitigating factors present," id. at 762, 108 P.3d 761. Schwimmer acted knowingly and intentionally, and the restitution was prompted by his client. We were clear that Schwimmer should be disbarred notwithstanding the restitution, because "the repayment does not eviscerate his or her ethical violation." Id. at 761, 108 P.3d 761.
¶ 52 Restitution is timely if the lawyer pays restitution before the disciplinary proceeding begins. As the commentary to the ABA Standards concludes, "lawyers who make restitution prior to the initiation of disciplinary proceedings present the best case for mitigation." ABA Standards std. 9.3 cmt. at 50. The commentary leaves open the possibility that "lawyers who make restitution later in the proceedings" might earn mitigation, but the commentary says those lawyers "present a weaker case." Id. Indeed, we held in Trejo that George P. Trejo's waiver of fees for the harmed client was "untimely," as it "followed the commencement of disciplinary proceedings," and thus this mitigating factor did not apply. 163 Wash.2d at 732, 185 P.3d 1160; See also In re Disciplinary Proceeding Against Cramer, 168 Wash.2d 220, 239, 225 P.3d 881 (2010) (refusing to apply this mitigator because the attorney did not start paying off tax warrants until after a disciplinary hearing). We can find no Washington decision applying this mitigating factor in a case where a lawyer pays restitution after the disciplinary proceeding begins. As the ABA Standards commentary concludes, "Lawyers who make restitution only after a disciplinary proceeding has been instituted against them ... cannot be regarded as acting out of a sense of responsibility for their misconduct, but, instead, as attempting to circumvent the operation of the disciplinary system." ABA Standards std. 9.4 cmt. at 51.
¶ 53 Preszler did not pay restitution on his own initiative, but only when the client demanded it, just as in Schwimmer. He wrote the check to Kinnie only after obtaining a signed agreement from the Gerrards releasing Preszler from liability for any damages arising from his misconduct. These actions do not evidence a lawyer acting out of a sense of responsibility for his misconduct. "He knew what he had done was wrong," as the hearing officer found. DP at 24. Preszler emphasizes that Kinnie's new attorney, Hames, is the one who suggested that the Gerrards sign the release. Regardless of *1132 who suggested it, Preszler agreed to it, instead of declining. Because Preszler readily accepted the release, he showed that he was not yet prepared to assume responsibility for the consequences of his actions.[8]
¶ 54 Preszler later waived the release, while the decision of the first hearing officer was pending. But withdrawing the release was not Preszler's idea; it was the first hearing officer's suggestion, as Preszler acknowledged in his waiver letter to Hames. Ex. 124 ("As part of the disciplinary matter, Mr. Rettig recommended that I waive the release in my favor.") The waiver letter was dated August 29, 2005-two years after Preszler's misconduct, and nearly a year after the WSBA first filed a complaint against Preszler. This waiver was too late to be considered a mitigating factor. Preszler is not entitled to mitigation for restitution because the requisite good faith and timeliness elements are absent.

(3) Mitigating: cooperation with the disciplinary proceeding

¶ 55 Another mitigating factor at issue is "full and free disclosure to disciplinary board or cooperative attitude toward proceedings." ABA STANDARDS std. 9.32(e). The Board, without explanation, accepted the hearing officer's finding that this mitigating factor applied. Not long ago, we refused to recognize that an attorney's full disclosure or cooperation could ever be a mitigating factor. See, e.g., In re Disciplinary Proceeding Against Dynan, 152 Wash.2d 601, 622, 98 P.3d 444 (2004) ("Although the ABA Standards list this as a mitigating factor, the court has held that it is not."); In re Disciplinary Proceedings Against Huddleston, 137 Wash.2d 560, 579, 974 P.2d 325 (1999) ("[C]ooperating with the disciplinary proceedings is not a mitigating factor, even though lack of cooperation may be an aggravating factor."). We have since acknowledged, however, that "[c]ooperation with the disciplinary proceedings as a mitigating factor may be appropriate in some cases," In re Disciplinary Proceeding Against Dornay, 160 Wash.2d 671, 686, 161 P.3d 333 (2007). But not all instances of cooperation deserve a mitigated sanction.
¶ 56 This mitigating factor applies only "in situations where an attorney goes above and beyond the compliance required in a disciplinary investigation or proceeding." Trejo, 163 Wash.2d at 732, 185 P.3d 1160 (emphasis added). Mitigation for ordinary compliance is inappropriate because "[i]t is the duty of every attorney to cooperate with a bar investigation." In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 747, 790 P.2d 1227 (1990). Failure to comply with the Rules for Enforcement of Lawyer Conduct (ELC) governing the disciplinary investigation or proceeding is an ethical violation under RPC 8.4(l), for which the lawyer may be admonished, reprimanded, suspended, or disbarred. ELC 1.5. Noncompliance may also be an aggravating factor that triggers a stiffer sanction for prior misconduct. See ABA STANDARDS std. 9.22(e). Ordinary cooperation and full disclosure are simply ways of avoiding additional charges or a harsher sanction for existing charges, and not a basis for mitigation. The burden is on the attorney to "show that his *1133 or her disclosure or cooperation surpassed what is required from all attorneys." Trejo, 163 Wash.2d at 733, 185 P.3d 1160 (emphasis added). Even if the attorney carries this burden, it "is not a particularly significant mitigating factor in determining an appropriate sanction." Johnson, 114 Wash.2d at 747, 790 P.2d 1227.
¶ 57 Nothing in the record suggests that Preszler went above and beyond his duties under the ELCs and RPC 8.4(l) to cooperate fully with the disciplinary proceeding. To the contrary, some evidence suggests that Preszler obstructed the proceeding. The WSBA filed a formal complaint against Preszler on October 4, 2004. Although ELC 10.5(a) required Preszler to file and serve an answer within 20 days, Preszler did not do so until March 4, 2005five months later. Not only was Preszler unresponsive, but the hearing officer also found he "was an unreliable historian with regard to the facts of this case." DP at 25. This finding was adopted by the Board, as were all the hearing officer's findings of fact. DP at 39. According to the hearing officer, Preszler told different stories in a February 11, 2004 letter to the WSBA, at a later deposition, and again at the hearing itself. That is not extraordinary disclosure worthy of sanction mitigation. Preszler does not deserve mitigation for his cooperation with the disciplinary proceeding.

(4) Mitigating: delay

¶ 58 The next contested mitigating factor is "delay in disciplinary proceedings." ABA STANDARDS std. 9.32(j). Delay is a mitigating circumstance when the respondent attorney is able to establish that the proceeding's time span resulted in unfair prejudice to him or her, or is caused by unjustified prosecutorial delay. This rule has controlled this court's analysis in case after case. See In re Disciplinary Proceeding Against Kronenberg, 155 Wash.2d 184, 196-97, 117 P.3d 1134 (2005); In re Disciplinary Proceeding Against Anschell, 149 Wash.2d 484, 515, 519, 69 P.3d 844 (2003); In re Disciplinary Proceeding Against Cohen, 149 Wash.2d 323, 341, 67 P.3d 1086 (2003) (Cohen I); In re Disciplinary Proceeding Against Kagele, 149 Wash.2d 793, 72 P.3d 1067 (2003); Huddleston, 137 Wash.2d at 576, 974 P.2d 325. The attorney's burden of establishing the mitigating factor of delay is more difficult to meet when the attorney plays a role in extending the length of time in the proceeding. See Cohen I, 149 Wash.2d at 341, 67 P.3d 1086; Kagele, 149 Wash.2d at 821, 72 P.3d 1067; In re Disciplinary Proceedings Against Dann, 136 Wash.2d 67, 83 n. 5, 960 P.2d 416 (1998).
¶ 59 The hearing officer applied the mitigating factor of delay, but the Board correctly concluded that it did not apply because Preszler did not meet his burden of showing he was unfairly prejudiced or that unjustified prosecutorial delay was the cause. As the Board noted, no evidence suggests that Preszler was unfairly prejudiced. Further, as the Board concluded, no evidence indicates prosecutorial delay, let alone unjustifiable delay, and the record shows that Preszler played a role in extending the length of time in the proceeding. Gerrard filed a grievance with the WSBA on January 28, 2004. Four and a half months later, the WSBA concluded an investigation and filed a complaint against Preszler on October 4, 2004. This was not slack prosecution, and Preszler himself took five months to file an answer. See Cohen I, 149 Wash.2d at 341, 67 P.3d 1086 (refusing to apply the mitigator of delay, in part because "portions of the delay can be attributed" to the lawyer, who waited nine months to reply to the grievance and two months to file an answer to the formal complaint).
¶ 60 The resolution of this case was delayed somewhat by the WSBA's pursuit of a second hearing, but the length of time between the first and second hearings is not a basis for mitigation. The WSBA acted swiftly and justifiably, and Preszler played a role in extending the time span. The first hearing lasted from May 24 to 27, 2005, and on August 19, 2005, the first hearing officer entered findings of fact, conclusions of law, and a recommendation. Just 13 days later, the WSBA appealed this decision to the Board. On March 21, 2006, three days before the Board was to hear oral argument on the appeal, Preszler filed a motion for a continuance. Just six days after rejecting *1134 Preszler's motion, the Board entered an order remanding the case for a new hearing.
¶ 61 The WSBA and Preszler then fought over the validity of the Board's order and the choice of a new hearing officer. On April 5, 2006, a hearing officer was appointed. Later that month, Preszler petitioned this court for discretionary review of the Board's order for a new hearing. On May 15, 2006, Preszler asked the Board to replace its chosen hearing officer. Before this request was decided, the WSBA filed a response with this court addressing Preszler's petition; we denied the petition on July 10, 2006. Three weeks later, the Board granted Preszler's request for a new hearing, and a new hearing officer was assigned to the case. At no time did the WSBA drag its feet, and Preszler's motions and petition for review protracted the proceeding just as much as anything the WSBA did. Preszler did not seem to be in a hurry. In fact, on November 27, 2006, Preszler and the WSBA jointly asked for the second hearing to be continued. If Preszler were prejudiced, one would not expect him to have asked that the second hearing be continued. After the Board granted the motion for a continuance, the second hearing was held April 16 to 20, 2007.
¶ 62 Preszler, however, insists that neither unfair prejudice nor prosecutorial delay is a prerequisite to applying the mitigator of delay. A long line of our cases holds differently. In Huddleston, two years elapsed between Huddleston's ethical breaches and the WSBA's start of disciplinary proceedings. 137 Wash.2d at 576, 974 P.2d 325. Still, the hearing officer refused to treat the two-year period as a mitigator, and we upheld that refusal because Huddleston did not show he was prejudiced. Id. In Kagele, the lawyer's ethical misconduct occurred in 1995-98. 149 Wash.2d at 799-808, 72 P.3d 1067. The WSBA filed a formal complaint on January 25, 2000, along with two amended complaints later that year. Id. at 808, 72 P.3d 1067. The hearing was in April 2001. Id. at 801, 72 P.3d 1067. Consistent with Huddleston, we held the delay was not a mitigating factor despite the passage of three to six years because "Kagele fail[ed] to demonstrate that the delay was inexcusable or undue." Kagele, 149 Wash.2d at 820-21, 72 P.3d 1067.
¶ 63 There are three more such cases. In Cohen I, over six years passed between the grievance (March 1995) and the disciplinary hearing (November 2001). 149 Wash.2d at 341, 67 P.3d 1086. This court acknowledged the delay was "substantial" but still refused to mitigate Cohen's sanction on the basis of delay. Id. He contributed to the protraction, and he failed to establish prejudice. Id. In Anschell, we refused to find delay was a mitigating circumstance because the lawyer failed to prove any delay was unjustified. 149 Wash.2d at 519, 69 P.3d 844. Further, this court rejected the lawyer's arguments that he suffered prejudice; we said financial difficulty and physical health are not prejudicial circumstances that trigger the delay mitigator. Id. at 515, 69 P.3d 844. In Kronenberg, the lawyer's ethical misconduct occurred in 1996, but the WSBA did not file a formal complaint until October 3, 2000, and the disciplinary proceeding did not take place until June 2003. 155 Wash.2d at 190, 117 P.3d 1134. This court held that the mitigating factor of delay did not apply because "Kronenberg has not shown that the delay in his case was inexcusable or undue, nor has he shown that the delay has prejudiced him in any way." Id. at 197, 117 P.3d 1134. As these cases show, again and again this court has turned down the invitation to find delay is a mitigating circumstance in the absence of some prejudice or lack of justification for the time span.
¶ 64 Where we have found delay, we have found prejudice or unjustified protraction of the proceeding. We have not simply tabulated the amount of time that passed as if we were giving credit for time served. In In re Disciplinary Proceeding Against Tasker, 141 Wash.2d 557, 568, 9 P.3d 822 (2000), the WSBA finished investigating the lawyer in October 1994 but did not file a complaint until February 1998. Noting that the lawyer suffered "the opprobrium of Bellingham's small legal community" and that the delay resulted from the WSBA's "administrative understaffing and slack prosecution," we found delay was a mitigating factor. Id. In In re Disciplinary Proceeding Against VanDerbeek, *1135 153 Wash.2d 64, 95, 101 P.3d 88 (2004), we upheld the hearing officer's application of the delay mitigator because the disciplinary proceeding did not take place until six to nine years after the grievances were filed against the lawyer. None of these circumstances present themselves here.[9]
¶ 65 Preszler relies on Tasker, in which we held mitigation was appropriate partly due to the lawyer's rehabilitation during the delay. 141 Wash.2d at 568, 9 P.3d 822. But that aspect of Tasker is inapposite. Although Preszler implemented procedures to prevent this sort of thing from happening again, he did so only "at the suggestion of the former hearing officer." DP at 25. We do not give credit for interim rehabilitation when the lawyer stopped behaving badly only in response to another person telling him to do so. See Dynan, 152 Wash.2d at 622, 98 P.3d 444.
¶ 66 Preszler also seems to conflate the mitigating factor of delay with the mitigating factor of "remorse." ABA STANDARDS std. 9.32(l). Preszler again notes his August 29, 2005 letter to Hames and characterizes the letter as a demonstration of his "willingness to accept responsibility for his actions." Opening Br. Resp't Preszler at 32. It is true the final three lines of the letter ask that Hames pass on Preszler's apologies to Kinnie. But Preszler did not apologize in the first letter he wrote to Hames on October 2, 2003, ex. 20, or at any other time until August 29, 2005, almost a year after the WSBA first filed its complaint. While his apology was the right thing to do, it came too late to deserve mitigation.

(c) Balancing the aggravators and mitigators

¶ 67 "The Board should deviate from the presumptive sanction only if the aggravating or mitigating factors are sufficiently compelling to justify a departure." In re Disciplinary Proceeding Against Burtch, 162 Wash.2d 873, 899, 175 P.3d 1070 (2008). Here, the presumptive sanction is disbarment. The only mitigating factors are Preszler's character and reputation and his lack of a prior disciplinary record. These factors are offset by the aggravating circumstances. Preszler has substantial experience practicing law. He committed four separate counts of ethical misconduct (assuming counts 14 and 15 are merged). Preszler presents few reasons to mitigate from disbarment.
¶ 68 This is a close case, however, and the Board recommended a suspension of three years. Although we disagree with the Board that the mitigating factors of cooperation with the disciplinary proceeding and timely good faith restitution can apply, the Board gave the latter factor little weight. We are willing to accept the Board's balancing of the aggravating and mitigating factors. Although "the ultimate responsibility for determining the nature of discipline rests with this court and not the Disciplinary Board," we rely on the Board's expertise and have chosen to be "guided by the recommendations of the Disciplinary Board." In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 95, 667 P.2d 608 (1983). "The court will adopt the Board's recommended sanction unless the sanction is not proportionate or the Board was not unanimous in its decision." Burtch, 162 Wash.2d at 900, 175 P.3d 1070 (citing In re Disciplinary Proceeding Against Miller, 149 Wash.2d 262, 277-78, 66 P.3d 1069 (2003)).

3. Step three: proportionality and unanimity of Board recommendation

¶ 69 Preszler bears the burden of showing the Board's recommended sanction is not proportionate. See Marshall, 160 Wash.2d at 349, 157 P.3d 859. To evaluate a recommended sanction's proportionality, we look to other cases in which we affirmed or rejected the same sanction. Id. at 348, 157 P.3d 859. For count 1, Preszler asks the court to consider our decisions in Brothers, *1136 Egger, Cohen I, and In re Disciplinary Proceeding Against Heard, 136 Wash.2d 405, 963 P.2d 818 (1998). For counts 14 and 15, Preszler asks us to consider our decisions in VanDerbeek and Schwimmer.
¶ 70 The cases cited by Preszler are not analogous to the circumstances of this case. In Brothers, Cohen I, and Egger, there were no board findings that the presumptive sanction was disbarment. Brothers, 149 Wash.2d at 585, 70 P.3d 940; Cohen I, 149 Wash.2d at 338, 67 P.3d 1086; Egger, 152 Wash.2d at 403, 98 P.3d 477. Also, in contrast to this case, none of the cases cited by Preszler involve a knowing avoidance of laws and court rules designed specifically to monitor the reasonableness of a lawyer's fee. Brothers, 149 Wash.2d at 579-81, 70 P.3d 940; Cohen I, 149 Wash.2d at 327-29, 67 P.3d 1086; Egger, 152 Wash.2d at 398-404, 98 P.3d 477; Heard, 136 Wash.2d at 417-18, 963 P.2d 818. The cases cited by Preszler are not comparable because they deal with a different presumptive sanction and different charge of misconduct. As for VanDerbeek and Schwimmer, we dismissed the Board's recommendation of suspension in favor of disbarring the attorney. VanDerbeek, 153 Wash.2d at 89-100, 101 P.3d 88; Schwimmer, 153 Wash.2d at 758-65, 108 P.3d 761. Preszler has failed to demonstrate how the recommended sanction of a three-year suspension lacks proportionality.
¶ 71 In considering the extent to which the Board's recommendation reflected unanimity, we note that the two dissenting board members suggested disbarment. All members therefore believed at least a three-year suspension is warranted. Of course, "[e]ven where a recommendation is unanimous, the court may depart from the recommendation if there are clear reasons for doing so." Dynan, 152 Wash.2d at 625, 98 P.3d 444 (citing Miller, 149 Wash.2d at 285, 66 P.3d 1069). But there are no clear reasons for doing so because too few mitigating circumstances are present.

V. CONCLUSION
¶ 72 We impose the Board's recommendation and order Preszler suspended from the practice of law for three years.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, GERRY L. ALEXANDER, SUSAN OWENS, and DEBRA L. STEPHENS, Justices.
SANDERS, J. (dissenting).
¶ 73 Attorney Terry J. Preszler breached Rules of Professional Conduct (RPC) in his representation of Kinnie and Jeffery Gerrard.[1] Preszler does not dispute most of these violations. He should suffer sanctions. In determining the appropriate penalty, however, the majority today improperly brushes aside mitigating factors that weigh in Preszler's favor. It also overemphasizes aggravating factors against him. Because I would suspend Preszler for 12 months instead of 3 years, I dissent.

ANALYSIS
¶ 74 We undertake a three-part analysis to determine the appropriateness of Washington State Bar Association (WSBA) Disciplinary Board (Board) recommendations. First, we inquire whether the Board properly established the presumptive sanction. In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 342, 157 P.3d 859 (2007). To do so we address (1) the ethical duties violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct. Id. Second, we consider aggravating or mitigating factors that counsel departure from the presumptive sanction. Id. Last, we look to the proportionality of the sanction and degree of agreement among board members. Id.
¶ 75 I largely agree with the majority that a single instance of impropriety may constitute conduct prejudicial to the administration of justice. See former RPC 8.4(d) (2002); majority at 1124-25. Similarly, while I believe counts 14 and 15 should merge because they concern the same conduct, I do not disagree with the majority's decision to assume "without deciding" that they merge *1137 because whether counts 14 and 15 merge has no bearing on the presumptive sanction in this case: disbarment. See majority at 1125. However, I dispute the majority's treatment of aggravating and mitigating factors.

I. Aggravating and Mitigating Factors
¶ 76 Once we determine the presumptive sanction, we next consider any aggravating or mitigating factors.[2]Marshall, 160 Wash.2d at 342, 157 P.3d 859. The hearing officer is in the best position to determine the attorney's state of mind and, accordingly, we defer to the hearing officer's findings unless they are not supported by substantial evidence. In re Disciplinary Proceeding Against Longacre, 155 Wash.2d 723, 744, 122 P.3d 710 (2005).
¶ 77 The hearing officer found only one aggravating factor: substantial experience in the practice of law. In contrast the hearing officer found five mitigating factors: (1) absence of a prior disciplinary record, (2) timely good faith effort to make restitution or to rectify consequences of misconduct, (3) full and free disclosure to Board and cooperative attitude toward proceedings, (4) character and reputation, and (5) delay in disciplinary proceedings. The hearing officer recommended a 30-day suspension based on the strength of Preszler's mitigating factors. Hr'g Officer's Findings of Fact and Conclusions of Law (FFCL) at 35.
¶ 78 The Board found an additional aggravating factor: multiple offenses. As for mitigating factors, first, the Board concluded that delay did not apply because Preszler suffered no prejudice and, second, while agreeing that the mitigating factor of timely good faith effort to make restitution applied, the Board determined it carried little weight. The Board rejected the hearing officer's recommendation and, instead, recommended a three-year suspension by a 9-to-2 vote.
¶ 79 Preszler argues the aggravating factor of multiple offenses does not apply (or applies with diminished weight) and that the mitigating factors of delay and timely effort to pay restitution should apply. I agree.

a. Unchallenged factors
¶ 80 The WSBA and Preszler agree that he is entitled to mitigating factors of (1) absence of prior disciplinary record and (2) character or reputation. On the other side of the coin, the parties agree Preszler should suffer the aggravating factor of substantial experience in the practice of law.

*1138 b. Challenged Factors

1. Aggravating: multiple offenses
¶ 1 I agree with the majority that Preszler committed multiple offenses against the Gerrards, but I would substantially reduce the weight given to this factor.
¶ 82 First, counts 14 and 15 should merge. In count 14 the hearing officer found that "[b]y disbursing to himself from his trust account a portion of the personal-injury proceeds, Mr. Preszler knowingly disobeyed obligations under the bankruptcy rules in violation of [former] RPC 3.4(c) [(1985)] and engaged in conduct that is prejudicial to the administration of justice in violation of [former] RPC 8.4(d)." FFCL at 32, ¶ 57. In count 15, the hearing officer found that "[b]y disbursing the personal-injury proceeds to himself without the consent, knowledge, or authority of the bankruptcy Trustee and bankruptcy Court, Mr. Preszler knowingly violated bankruptcy rules with the intent to gain a benefit for himself." FFCL at 33, ¶ 58.
¶ 83 Both counts 14 and 15 involve the same conduct and the same type of violation, i.e., Preszler disbursed funds to himself without the bankruptcy court's approval as required by the bankruptcy court rules and federal law. A finding of either count leads to the same presumptive sanction: disbarment. Preszler is correct that counts 14 and 15 should have been viewed as one offense.
¶ 84 Counts 14 and 15 aside, a clear preponderance of the evidence suggested Preszler also committed misconduct by charging an unreasonable fee (count 1), failing to explain the bankruptcy exemptions to Kinnie (count 3), and failing to properly supervise his paralegal (count 17). It is important to point out, however, that all of Preszler's misconduct was "isolated to a single client and a single legal action lasting [a short period of time]." In re Disciplinary Proceeding Against Eugster, 166 Wash.2d 293, 322, 209 P.3d 435 (2009). Moreover, the presumptive sanction attached to count 3 is admonition and the presumptive sanction for count 17 is reprimand. These sanctions are significantly less severe than disbarment, the presumptive sanction for counts 14 and 15. Accordingly I would give little weight to this aggravating factor.

2. Mitigating: good faith effort to pay restitution
¶ 85 The hearing officer found Preszler satisfied the mitigating factor of timely good faith effort to pay restitution. The Board, in turn, accepted this finding, but gave it little weight because it found Preszler required Kinnie to sign a release to get her money back. Now the majority flatly rejects mitigation for Preszler's restitution. The majority suggests Preszler did not act on his own initiative because the Gerrards "demand[ed]" that Preszler make restitution. Majority at 1131-32. In the same vein, it suggests the release Preszler obtained tainted his effort to make restitution. Id.
¶ 86 The majority fundamentally misinterprets the interplay between Preszler and Bill Hames, the Gerrards' bankruptcy attorney. During Hames's phone conversation with Preszler, Hames pointed out that Preszler had made an error on the wild card exemption and that he had erroneously accepted a contingent fee. FFCL at 22, ¶ 45. Hames suggested Preszler make amends by repaying the contingent fee. FFCL at 23, ¶ 45. While it is true in their initial conversation Hames requested that Preszler refund the improperly collected fee, a better way of viewing the interaction is that Hames notified Preszler of his error. In response to that new information, Preszler "immediately" acknowledged his mistake and reimbursed his trust account for the contingent fee. FFCL at 23, ¶ 46. Labeling Hames's conversation with Preszler a demand, without acknowledging it also served as Preszler's first opportunity to correct his mistake, mischaracterizes the course of events. Upon being notified of his error, Preszler made an immediate good faith effort to repay his former client.
¶ 87 Second, the evidence clearly shows that Hames suggested and offered the release to Preszlernot the other way around. The release was Hames's idea. Preszler did not require the Gerrards to sign anything before he made restitution. Yet the majority rebukes Preszler to suggest "he was not yet *1139 prepared to assume responsibility for the consequences of his actions." Majority at 1132. Requiring Preszler to decline a release confuses remorse with stupidity. Remorse, or even assuming responsibility for his actions, did not require Preszler to expose himself to liability, let alone look a gift horse in the mouth, in order to make a good faith effort to pay restitution. In any event, Preszler voluntarily withdrew the release while the decision of the first hearing officer was pending.
¶ 88 The majority improperly rejects Preszler's good faith effort to make restitution. I would give this mitigator its proper undiminished weight.

3. Mitigating: delay
¶ 89 The hearing officer found the mitigator of delay. The Board, however, determined that because there was no showing of prejudice to Preszler and because the record did not show that the WSBA caused the delay, delay did not apply. The majority incorrectly embraces the Board's determination.
¶ 90 "[D]elay in the prosecution of a case is a mitigating factor to be balanced against any aggravating factors, but it does not automatically merit a reduction in sanction." In re Disciplinary Proceeding Against Tasker, 141 Wash.2d 557, 568, 9 P.3d 822 (2000) (citing In re Disciplinary Proceedings Against Dann, 136 Wash.2d 67, 82-83, 960 P.2d 416 (1998)). Demonstrated prejudice and impropriety by the WSBA weigh toward a drastic mitigation of sanctions; however, they are not strictly required. Nonprejudicial delay, while perhaps entitled to reduced weight, should not be viewed as without weight altogether.
¶ 91 The majority saddles Preszler with the burden of proving he was unfairly prejudiced or that unjustified prosecutorial delay was the cause. Majority at 1133. While the cases cited by the majority generally stand for that proposition, we have also held that delay operates as a mitigating factor in less stringent (i.e., nonprejudicial) circumstances. In In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 606, 48 P.3d 311 (2002), we held that the mitigating factor of delay applied even though "the record does not indicate Carmick was harmed by the delay" and "the effect of the delay in this instance was very slight." While the Carmick court gave delay diminished significance, it nonetheless counted the factor in the attorney's favor. Id. ("The only mitigating factor is a delay in the disciplinary proceedings.").
¶ 92 We have also shown an inclination to count delay as a mitigator when the attorney takes rehabilitative steps during the delay. See Tasker, 141 Wash.2d at 568, 9 P.3d 822. Delay should apply here as well because Preszler "made the most of the delay by demonstrating his willingness and ability to clean up his act .... [and] the delay in prosecution was caused through no fault of his own." Id. The hearing officer found neither Preszler nor the WSBA responsible for the delay. The hearing officer also found Preszler had "undertaken measures in his practices to make []sure that occurrences of the type [charged] will not occur again" and that he had sent a letter expressing remorse to Kinnie. FFCL at 25, ¶ 50. In addition, Preszler voluntarily withdrew the release of liability, showing his willingness to take responsibility for his actions. Given Preszler's positive actions, during what was a faultless delay, I agree with the hearing officer and give some consideration to the mitigating factor of delay.

c. Balancing the factors
¶ 93 When reviewing sanction recommendations, this court "does not lightly depart from the Board's recommendation; however it is not bound by it." Tasker, 141 Wash.2d at 565, 9 P.3d 822 (citing In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 317, 962 P.2d 813 (1998)). This court retains the ultimate responsibility for determining the nature of an attorney's discipline. Id.
¶ 94 In the end, the aggravating factors of (1) substantial experience in the practice of law and (2) multiple offenses, while substantially reduced in weight, militate against Preszler. In contrast, the mitigating factors of (1) absence of prior disciplinary record, (2) *1140 character or reputation, (3) restitution, and (4) delay favor Preszler. The overwhelming weight of the mitigating factorsmore than twice that of aggravating factorsshould persuade us to depart from the Board's recommendation.
¶ 95 Because I would suspend Preszler's law license for 12 months instead of 3 years, I dissent.
WE CONCUR: TOM CHAMBERS and JAMES M. JOHNSON, Justices.
NOTES
[1] For the sake of clarity, we use the Gerrards' first names when referring to them individually. We intend no disrespect.
[2] At the time, the bankruptcy trustees in the United States Bankruptcy Court for the Eastern District of Washington required such applications. The applications are no longer required.
[3] Of the original $31,000 payment from Allstate, a total of $27,075 was exempted and $2,925 was applied to the Gerrards' payment plan. The record does not indicate clearly what happened to the remaining $1,000.
[4] The hearing officer also found that a clear preponderance of the evidence supported count 12, a violation of former RPC 3.3(a)(1) (1985) and former RPC 8.4(c) (1985) and (d) (2002). After the hearing officer entered his findings and before the Board's decision, the WSBA and Preszler stipulated to a dismissal of that count.
[5] Preszler does not challenge the conclusion that reprimand is the presumptive sanction for counts 3 and 17.
[6] The dissent argues that we should give this aggravating factor little weight. We emphasize that Preszler's misconduct went beyond his client and extended to his abuse of the legal process and to his mismanagement of his paralegal. Preszler breached his ethical duty to the legal system by knowingly violating the bankruptcy court rules, see standard 6.0, and he breached his ethical duty as a legal professional by failing to properly manage a nonlawyer assistant, see standard 7.0. The aggravating factor of multiple offenses therefore deserves some weight, although not as much as we might accord in other cases.
[7] When the lawyer has the less culpable mental state of negligence, it might make sense to view restitution as a mitigating circumstance if it is given in response to a client demand. The negligent lawyer did not know the conduct was wrongful, and so a client demand for restitution could be the first time the negligent lawyer realizes the need to pay restitution.
[8] The dissent is too charitable in describing Hames' contact with Preszler. The hearing officer found that Hames "demanded that Mr. Preszler pay the Gerrards `all money received from Allstate Insurance Company,'" and also "demanded an itemization." Findings of Fact and Conclusions of Law at 23. In the letter memorializing the phone call, Hames wrote, "This will confirm our phone conversation in which Mr. and Mrs. Gerrard have demanded and you have agreed to pay to them all money received from Allstate Insurance Company." Ex. 19. The dissent also disregards Preszler's knowledge. Preszler knew about the circumstances of the improper fee, and he knew that the bankruptcy rules prohibited him from disbursing the funds to himself. Because he knew what he was doing at the time, he also knew there was a problem requiring mitigation. The dissent is thus incorrect to describe the reimbursement demand from the Gerrards as his first opportunity to rectify the situation. Dissent at 1138-39. The dissent also characterizes Preszler's acceptance of the release as the smart thing to do. Id. at 1138-39. Unquestionably, the release was good for Preszler. But was it good for anyone else? Preszler's misconduct affected the Gerrards, the legal profession, and the legal system. And yet he elevated his own interest in avoiding liability above the interests of making the Gerrards whole and of Preszler's taking responsibility. The purpose of the mitigating factors is not to reward an attorney's calculation of self-interest.
[9] Carmick does not support the dissent's position. See dissent at 1139. In Carmick, over four years passed between the day the grievance was filed with the WSBA and the day of the first disciplinary hearing. 146 Wash.2d at 590. 48 P.3d 311. Despite that protracted prosecution, we still concluded that the weight of the delay factor was "very slight" because "the record does not indicate Carmick was harmed by the delay." Id. at 606, 48 P.3d 311. If anything, Carmick suggests that a disciplined lawyer must show both prejudice and slack prosecution.
[1] Hereinafter Kinnie's first name is used for the sake of clarity.
[2] The ABA Standards sets out a list of aggravating factors that may be considered. Aggravating factors include:

(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution.
ABA STANDARDS foR IMPOSING LAWYER SANCTIONS std. 9.22 (1991 ed. & Supp. 1992).
The ABA Standards sets out a list of mitigating factors that may be considered. Mitigating factors include:
(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical disability;
(i) mental disability or chemical dependency including alcoholism or drug use when:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely;
(j) delay in disciplinary proceedings;
(k) imposition of other penalties or sanctions;
(l) remorse;
(m) remoteness of prior offenses.
ABA STANDARDS std. 9.32.