257 P.3d 599 (2011)
171 Wash.2d 781
In the Matter of the DISCIPLINARY PROCEEDING AGAINST W. Russell VAN CAMP, an Attorney at Law.
No. 200,811-9.
Supreme Court of Washington, En Banc.
Argued March 8, 2011.
Decided June 16, 2011.
*601 Dustin Douglass Deissner, Van Camp & Deissner, Spokane, WA, for Petitioner.
Joanne S. Abelson, Washington State Bar Association, Seattle, WA, for Respondent.
C. JOHNSON, J.
¶ 1 This attorney discipline case focuses on an ambiguous written fee agreement, the representation provided in the litigation, and the attorney's conduct during the grievance investigation. Attorney W. Russell Van Camp required a $25,000 initial "retainer" fee to represent a client in an injunction suit, but he did not explain to the client whether it was a nonrefundable flat fee, an hourly fee, or something else. Nor did the fee agreement Van Camp prepared. When the client expressed confusion about the fee, Van Camp asserted it was a flat fee and made no effort to renegotiate in accordance with the client's understanding that he would be charged an hourly rate. In the suit, despite numerous settlement offers from opposing counsel and his client's desire to settle, Van Camp resisted settlement, prolonging the case, and neither communicated nor explained the settlement offers to the client. The client was not consulted or advised concerning the claims against him and the options available to him in resolving the case. After the client filed a grievance with the Washington State Bar Association (WSBA), Van Camp submitted differing and exaggerated time reconstructions based on hours he claimed to have worked on the case to justify the amount of the fee, despite having little to no work to *602 show for it. We adopt the Disciplinary Board's reconstruction and disbar Van Camp.

FACTS[1]
¶ 2 Van Camp has been practicing law since 1973. He has handled 37 cases in the United States District Court, Eastern District of Washington, where this client's suit was filed. He practices in Spokane, emphasizing in personal injury, criminal law, and family law. This proceeding arises out of Van Camp's representation of Randy Honkala, a car enthusiast. Honkala had obtained a "power lease" certificate for $5,000 that gave him purchasing priority for a Shelby Mustang. Honkala purchased the car through his previous employer, Wendle Motors, but it was delivered in poor condition, so Honkala returned it. Honkala expected to realize a profit on the car, but lost any expected profit and the $5,000. Then he discovered that Wendle had listed the returned vehicle on an auction site and was reselling it for a profit without disclosing the defects. Honkala contacted the auction's highest bidder to report the problems, which dissuaded the bidder from purchasing the car, and Honkala also made numerous derogatory posts about Wendle on various web sites.
¶ 3 Wendle, represented by Richard Campbell, sued Honkala in federal court in November 2006, seeking injunctive relief to stop the Internet postings, but additionally alleging various claims and seeking attorney fees.[2] A telephonic temporary restraining order (TRO) hearing was held in December 2006, and Honkala appeared pro se. Campbell said he wanted to get the case resolved without going to trial if possible. Honkala agreed to the restraining order so long as it was mutual. Wendle then moved for a preliminary injunction, noted for argument on December 20, 2006. Wendle e-mailed Honkala a proposed stipulation and permanent injunction that would have resolved the case through mutual restraints on defamation, and with all other claims against Honkala dismissed. Exs. Sent to Disciplinary Board (hereinafter Board Ex.) Exs. 5, 33. The e-mail conveyed that Wendle's primary purpose was for Honkala to stop the Internet postings. Honkala did not understand the permanent injunction, so, rather than reply to Wendle, he sought counsel.
¶ 4 Honkala found Van Camp's name in a phone book, and met with him on December 15, 2006, bringing the documents Wendle had sent. Van Camp required Honkala to pay him a $25,000 "retainer." Van Camp did not explain how the fee would be calculated or whether it was refundable; Van Camp did inform Honkala that if the case settled within a week, he would return most of the $25,000. Honkala testified they discussed hourly rates. The fee agreement itself lists several items:

 A. An earned retainer of: $25,000
 B. An hourly rate, computed as
 follows:
 Mr. Van Camp, Mr. Deissner 250.00
 Mr. Shaw 100.00
 Paralegals 50.00
 Secretarial 25.00

Board Ex. 6. A small finger icon pointed to "A" on the agreement. The agreement also states, "Monies paid by the client shall be considered as earned towards the ultimate total fee, unless otherwise designated." But the meaning of "earned retainer" is not explained, nor is the scope of representation defined other than to represent and defend Honkala in a suit. Honkala was not given a copy of the fee agreement. He obtained $25,000 through a home equity loan and brought Van Camp a check a few days later.
¶ 5 Van Camp phoned Wendle's counsel, Richard Campbell, that same day, December 15, 2006. He joked that Campbell should *603 send him a box of chocolates to thank him for all the money Campbell would make on this case. Later that day, Campbell faxed Van Camp a letter that mentioned the box of chocolates remark as tongue-in-cheek but communicated Wendle's desire to quickly resolve the case without further litigation. The letter referenced the settlement and proposed permanent injunction as attached, but evidently it was not transmitted with the letter. Van Camp did not respond to the letter or request the missing attachment, except to call Campbell's office to complain to the answering extern about his displeasure at seeing the chocolates remark in writing.
¶ 6 Little work was done on Honkala's case. Notices of appearance were filed by both Van Camp and his partner, Dustin Deissner. A declaration for Honkala was filed with a memo in opposition to the emergency TROwhich had already been granted: the upcoming hearing was for a preliminary injunction scheduled for December 20, 2006. Deissner represented Honkala in that telephonic hearing, and the preliminary injunction was granted. Van Camp performed no work in response to the preliminary injunction, and there is no evidence that he explained its significance to Honkala.
¶ 7 On February 21, 2007, Campbell sought a response to his December 15, 2006, letter, because a status conference was quickly approaching, but Van Camp did not respond. Van Camp participated in a telephonic scheduling conference in March, with a resulting discovery deadline of September 10, 2007. Someone in Van Camp's office answered Wendle's interrogatories in the middle of April, but no discovery was prepared on behalf of Honkala until late August.
¶ 8 In early March, Honkala sent Van Camp a letter expressing his concerns. Board Ex. 14. Honkala reminded Van Camp of his desire that the case be resolved as quickly as possible, given there was no benefit to prolonging it. Second, Honkala requested copies of the documents filed in his case to see what had been done to resolve it and stated he had asked several times yet received nothing. Third, Honkala requested an itemized bill showing what charges had been made against the $25,000 retainer. A week later, in full, Van Camp replied:
As to the breakdown of fees, our retainer agreement was for an earned retainer (flat fee), you would not be charged any more attorney fees. You don't have to worry about an additional charge for attorney fees. I do not keep hours on such retainers. If you have any questions let me know.
Board Ex. 17. The request for documents and more communication was repeated the following day by both Honkala and his wife. Honkala additionally sought any document stating the $25,000 was a flat fee. A packet of materials was sent, but it is unclear what this included. The Honkalas e-mailed again, wishing to discuss the claims against them, the steps being taken, and seeking a copy of the retainer agreement. Van Camp did not respond.
¶ 9 On July 20, 2007, Van Camp filed an answer to Wendle's complaint. He included a counterclaim against Wendle seeking the lost contract expectancy regarding the Shelby Mustang and damages for Wendle's defamation of Honkala. Board Ex. 23. Wendle had never moved for default, but Campbell requested an answer before the mediation Van Camp had scheduled for July 25, 2007. At the mediation, Honkala sought the $25,000 in attorney fees he had paid Van Camp, but Wendle rejected any legal responsibility for those fees. When the mediator mentioned the offer of settlement, it surprised Honkala, who was unfamiliar with the offer. The mediation was unsuccessful.
¶ 10 Following the attempted mediation, Honkala again e-mailed Van Camp, seeking copies of anything filed in support of the counterclaim. The e-mail reiterated Honkala's desire to resolve the case quickly. Following receipt of the few documents Van Camp could provide, Honkala sought a copy of the proposed permanent injunction referenced in Campbell's December 15, 2006, letter. Van Camp could not provide this as he never informed Campbell the injunction itself was not attached. Instead, Van Camp replied that this referenced the preliminary *604 injunction already in place.[3] Additionally, the copy of Campbell's letter sent to Honkala had been altered by a staff member in Van Camp's office. The altered version did not contain the box of chocolates reference or that it was Wendle's desire to resolve the case quickly through a simple cease and desist agreement.[4]
¶ 14 Honkala filed a grievance against Van Camp on July 31, 2007. Van Camp received this on August 8, 2007, and sent an apologetic e-mail the next day. He stated there was still a good chance to have the matter resolved in Honkala's favor and asked if he should pursue settlement. In his response to the WSBA, Van Camp stated he had done enough work to have earned most of the fee. But, he stated, if the case settled, he would be happy to review the fee with Honkala, and if he, Van Camp, felt it was unreasonable, he would refund some of it. If Honkala disagreed, then Van Camp would submit the matter to fee arbitration. He did not offer this directly to Honkala.
¶ 12 At the end of August, Van Camp informed Honkala that he had scheduled a deposition of Chud Wendle. Honkala replied that he had not yet seen the permanent injunction and settlement offer, which he thought he should review, and that he wanted to settle. Board Ex. 41. Despite now having a copy of the settlement offer and permanent injunction, Van Camp replied that the only offer was the one previously transmitted directly to Honkala and attached the current preliminary injunction.
¶ 13 The deposition was taken, with Honkala's participation, as Van Camp requested. Van Camp asked only the questions Honkala had provided. This was the only discovery completed on behalf of the counterclaim. Van Camp suggested he would move to extend the discovery cutoff date, but never did. He prepared deposition notices for four Wendle employees, but Honkala fired Van Camp the same day these were preparedAugust 31, 2007. Honkala sought a statement of actual costs incurred and a refund of the remainder, neither of which he received.
¶ 14 Honkala then contacted Campbell himself in early September and sought $5,000 (the cost of the power lease) to settle, which Wendle refused. Honkala took the proposed permanent injunction to another attorney to review. That attorney charged Honkala $150 per hour, for a total fee of about $500. The lawsuit settled and was dismissed at the end of September 2007.

WSBA INVESTIGATION, HEARING, AND DISCIPLINARY BOARD REVIEW
¶ 15 In October 2007, Van Camp sent a follow-up letter to the WSBA. Regarding the fee agreement, he wrote: "As far as I can tell, Mr. Honkala is a competent adult able to read and write." Board Ex. 65. But he agreed to forgo the flat fee and attached a time reconstruction showing he had earned well over $25,000, so the issue of a refund was moot. In discussing the case, Van Camp gets the procedural history wrong, stating Honkala represented himself at the preliminary injunction hearingbut Honkala was pro se at the TRO hearing and was represented by Van Camp's partner Deissner at the preliminary injunction hearing. Van Camp states he never saw nor received a copy of any of the injunctions, despite, at the very least, Campbell's fax in August 2007. He denied receiving any communication from Campbell on December 15, 2006, although this is the date of the chocolates reference being included in the letter sent by Campbell, which, more importantly, sought a permanent injunction and quick settlement.
¶ 16 During the investigation, Van Camp submitted various estimates of hourly charges to justify his retention of the $25,000. Van Camp's paralegal, Christian Barber, who had been directed to create these reconstructed time sheets, testified that he started by using tenth-of-an-hour increments, as he had learned to do in school. *605 This resulted in a total fee between $8,000 and $10,000. Van Camp reviewed this and instructed Barber to use half hour increments for attorney time, in accordance with the fee agreement. The new calculations resulted in a fee between $16,000 and $20,000. Still too low for Van Camp, he directed Barber to add that Van Camp had reviewed every document that came in and went out, and each instance merited at least a half hour on the spreadsheet. This resulted in a total figure of $33,000, which Van Camp submitted to the WSBA.
¶ 17 The WSBA charged Van Camp with nine counts of misconduct, alleging numerous Rules of Professional Conduct (RPC) violations. After a five day hearing, the hearing officer found six of the nine charges proved. She recommended a two year suspension and $15,000 restitution. The charges found proved are as follows:
Count 1
By not abiding by the client's objectives to try to settle the case as quickly as possible, Respondent violated RPC 1.2(a).
Count 2
By failing to follow up with attorney Richard Campbell's December 15, 2006 letter and other settlement proposals, Respondent violated RPC 1.3.
Count 3
By failing to timely provide the client with copies of letters and settlement proposals, even after repeated requests, Respondent violated RPC 1.4(a).
Count 4
By failing to explain clearly at the outset of representation how his fee would be calculated and/or how the client's $25,000 payment would be applied, Respondent violated RPC 1.4(b) and/or RPC 1.5(b).
Count 5
By charging $25,000 under the facts of this case, Respondent violated RPC 1.5(a).
Count 9
By misrepresenting in his July 31, 2007 letter to Honkala that Campbell had provided a proposed preliminary injunction with his December 15, 2006 letter, Respondent violated RPC 8.4(c).
Decision Papers at 000002-03 (Findings of Fact). The hearing officer found American Bar Association's Standards for Imposing Lawyer Sanctions standard 4.42 (1991 & Supp. 1992), with a presumptive sanction of suspension, applied for counts 1, 2, 3, and 9. The hearing officer found injury to the client and the profession, but not serious or potentially serious injury. For counts 4 and 5, the hearing officer applied standard 7.2, also with a presumptive sanction of suspension. Again, she found injury, but not serious injury, to the client. As a mitigating circumstance, the hearing officer mentioned Van Camp's reputation as a successful plaintiff's personal injury attorney. The aggravating factors were more extensive:
(a) Prior Disciplinary Offenses. Before this proceeding, Van Camp had been disciplined three times. In 1985, he was censured for charging an unreasonable fee. In 2002, he was suspended for six months for making false statements in his bankruptcy proceeding. In 2005, Van Camp was reprimanded for using the term "earned retainer fee" when the actual purpose of the money, whether for fees, costs, or both, was unclear. This last offense was of particular note because the term "earned retainer" was still included in Van Camp's retainer agreement without additional explanatory language. The hearing officer thought the false statements in the bankruptcy proceeding relevant as reflecting poorly on Van Camp's record for truthfulness and honesty, and "is indicative of a serious disregard for upholding the integrity of the legal system and the profession." She thought the 1985 excessive fee offense was too remote in time to matter. [Decision Papers at 000027.]
(b) Dishonest or selfish motive. The hearing officer concluded an initial $25,000 fee created a disincentive to *606 defend or pursue the client's case; further, the deliberate withholding of the December 15, 2006 letter and settlement proposals prolonged the litigation with the selfish motive of justifying the fee.
(c) Bad faith obstruction during disciplinary process. The WSBA alleged and Van Camp did not contest bad faith in his replies to Honkala's grievance and questions posed by the WSBA, except to dispute knowledge of the altered [chocolates] letter. The hearing officer concluded the time sheet submitted was a "grossly over-inflated fabrication of time and services," and was submitted in bad faith. [Decision Papers at 000028.]
(d) Refusal to acknowledge wrongful nature of conduct. Despite prior discipline, Van Camp consistently denied any wrongdoing, refused to accept a share of the responsibility, placed blame on an unsophisticated client for giving inconsistent instructions, criticized opposing counsel for his own behavior [chocolates remark], and pointed out his staff's mistakes, lack of diligence and incompetence. Of note was his failure to provide ethical training to his staff, and that he allowed his secretary to accept entire legal responsibility for potentially committing a felony without any willingness to bear the consequences of her action.
(e) Substantial experience in the practice of law. Van Camp's extensive experience did not benefit his client, nor did it result in a high level of understanding the RPCs.
Decision Papers at 00026-29.
¶ 18 On review, the Disciplinary Board adopted the findings but increased the presumptive sanction to disbarment because the client, the legal system, and the profession suffered serious injury. The Disciplinary Board added an additional aggravating factor: indifference to making restitution, because three years had passed with no voluntary refund to Honkala. The Disciplinary Board found the aggravating factors out-weighed the mitigating factor, justifying disbarment. The Disciplinary Board's vote was seven to three, with the dissenters recommending a three year suspension.
¶ 19 Van Camp challenges the recommendation in this court. He argues procedural errors denied him a fair hearing and requests a new one. Alternatively, he disagrees with the conclusions of law made by the hearing officer and adopted by the Disciplinary Board, and he argues the injury was not serious and that his mental state was mere negligence, so he should only be sanctioned with a suspension of six months or less.

ISSUES
1. Did procedural errors deny Van Camp a fair hearing?
2. Does substantial evidence support the findings of misconduct?
3. Is the recommended sanction of disbarment appropriate?

ANALYSIS
¶ 20 This court has the ultimate responsibility of disciplining lawyers. In re Disciplinary Proceeding Against Preszler, 169 Wash.2d 1, 15-16, 232 P.3d 1118 (2010) (citing In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 329, 157 P.3d 859 (2007)). We review conclusions of law de novo and uphold them if supported by the findings of fact. In re Disciplinary Proceeding Against Whitney, 155 Wash.2d 451, 461, 120 P.3d 550 (2005) (citing In re Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 759, 801 P.2d 962 (1990)).

1. Did procedural errors deny Van Camp a fair hearing?
¶ 21 Van Camp argues that he was denied a fair hearing based on two decisions by the hearing officer. First, he argues the WSBA should not have been allowed to call a rebuttal expert after failing to list any experts on its witness list. His entire defense, he argues, was based on the WSBA's representation that it would not call experts, and after it was allowed to do so, he could not "catch up." Although parties have a right *607 under Rules for Enforcement of Lawyer Conduct (ELC) 10.13(d)[5] to submit rebuttal evidence, he argues this should be limited to exhibits or previously disclosed witnesses. A party should not be allowed to withhold evidence proper to its case in chief, only to cumulatively present it at the end of the defendant's case.
¶ 22 The WSBA explains that it initially chose to forgo expert witnesses, reserving the right to call rebuttal witnesses, but then sought to amend after seeing Van Camp's list of three experts to testify concerning the reasonableness of Van Camp's fee. The hearing officer denied the request as untimely, but allowed, as rebuttal evidence, the named expert to testify following Van Camp's expert's testimony. The WSBA analogizes this to character evidence, so that once Van Camp had "opened the door," it had a right to rebut that testimony. Moreover, the WSBA argues, the motion to call the rebuttal expert was granted June 1, 2009, but the expert did not actually testify until July 9, 2009, giving Van Camp sufficient time to obtain discovery about the expert's testimony. Since he chose not to, he cannot establish error. See State v. Swan, 114 Wash.2d 613, 654-55, 790 P.2d 610 (1990) (defense had a full day to prepare for rebuttal witness, did not request a continuance or seek to reopen case, therefore no abuse of discretion). We agree.
¶ 23 Evidentiary rulings are reviewed for abuse of discretion. Marshall, 160 Wash.2d at 341, 157 P.3d 859. Such abuse occurs only when no reasonable person would take the adopted view. In re Disciplinary Proceedings Against Bonet, 144 Wash.2d 502, 510, 29 P.3d 1242 (2001). Van Camp does not explain how the hearing officer's decision was manifestly unreasonable. The hearing officer wanted to hear from a rebuttal expert regarding the fee, and without a specific articulation of why no one would think this a reasonable thing to do, we will not overturn her decision.
¶ 24 Next, Van Camp argues he should have been permitted to delve into the mediation, because doing so would have revealed Honkala's duplicity. But Van Camp was allowed to discuss the mediation. Van Camp was asked by his counsel, Deissner, whether Honkala was told he could settle by walking away, and Honkala still chose not to walk away. Van Camp so testified, and Deissner stated that was the only question he needed to ask. 3 Report of Proceedings (RP) at 726-30. It is unclear what else Van Camp feels should have been discussed to reveal Honkala's alleged duplicity, and again, he does not explain how the hearing officer's limiting the mediation discussion was manifestly unreasonable. As the WSBA points out, Van Camp does not cite to any specific ruling by the hearing officer and does not establish that error occurred. State v. Riker, 123 Wash.2d 351, 369, 869 P.2d 43 (1994) (objection to exclusion waived when party fails to seek final ruling following tentative ruling on motion in limine). Van Camp has not established grounds for a new hearing.

2. Does substantial evidence support the findings of misconduct?
¶ 25 The WSBA must prove misconduct by a clear preponderance of the evidence. This is more than a mere preponderance, but less than beyond a reasonable doubt. The Disciplinary Board's ultimate conclusions of misconduct are upheld if supported by substantial evidence in the record, that is, sufficient evidence to persuade a fair-minded, rational person. Marshall, 160 Wash.2d at 330, 157 P.3d 859.
Count 1
By not abiding by the client's objectives to try to settle the case as quickly as possible, Respondent violated RPC 1.2(a).
¶ 26 A lawyer is required to abide by the client's decisions concerning the objectives of the representation, the means by which those are carried out, and whether to accept a settlement offer. RPC 1.2(a). The hearing officer concluded Van Camp failed to assist Honkala in making decisions, failed to follow his instructions, and failed to advise him throughout, including not advising Honkala *608 that he could settle the claims against him early in the representation through the permanent injunction. We find sufficient evidence exists to support this finding of misconduct.
¶ 27 The record establishes that Honkala repeatedly indicated he wished for quick resolution of this case, and yet Van Camp never communicated, nor explained the permanent injunction and offer of settlement to him. In fact, given Van Camp's admissions to the WSBA, it seems Van Camp never reviewed the permanent injunction at all. This failure to review, communicate, and explain the settlement offer is alarming. Van Camp could not abide by his client's decision concerning settlement if the client was never presented with the option of settlement. An attorney must communicate offers of settlement to the client and discuss in meaningful terms the advantages or disadvantages of accepting the proposal. This includes the lawyer's fees and costs associated with the various options. Then the attorney should make recommendations to the client about what is best, but the client controls and decides what to do regarding the claims. Van Camp did none of these things, constituting a violation of his ethical duties as an attorney.
¶ 28 While Van Camp argues Honkala's objectives were unclear because he gave conflicting instructions, that is, to pursue the counterclaims aggressively and to settle quickly, as the WSBA articulates, these are compatible. Aggressive pursuit of the counterclaims might have placed pressure on Wendle to settle with more favorable terms for Honkala. Moreover, Honkala's confusion and somewhat contradictory instructions in this case are, unfortunately, further evidence that Van Camp failed to properly counsel his client.
¶ 29 Van Camp's arguments on this count do him more harm than good. He continues to blame the client as the source of confusion. He argues Honkala understood what the permanent injunction called for right from the beginningbut if this is so, Honkala had no need of Van Camp or his $25,000 services.[6] Van Camp thought Honkala was seeking damages and refers to Honkala's various grievances against Wendle, but most of these were not made in the counterclaim. He blames Honkala for not settling at the mediation, but Honkala was leery of settlement only because it meant he lost the entirety of money he had paid to Van Camp. Van Camp states there was never a clear instruction from Honkala to settle despite not getting anything in return, but, in the material before us, quotes Renee Honkala's e-mail expressly stating that position. Board Ex. 44. Van Camp repeatedly asserts that an attorney should not be disciplined for failing to tease out what his client really wishes. But, in this record, extensive documentary evidence exists showing Honkala desired quick settlement and an end to the litigation. We therefore agree with the Disciplinary Board that Van Camp violated RPC 1.2(a).
Count 2
By failing to follow up with attorney Richard Campbell's December 15, 2006 letter and other settlement proposals, Respondent violated RPC 1.3.
¶ 30 "A lawyer shall act with reasonable diligence and promptness in representing a client." RPC 1.3. The Disciplinary Board concluded that Van Camp's failure to respond to Campbell's offers to settle violated RPC 1.3. We find that this is also supported by substantial evidence. Campbell sent Van Camp a settlement offer the very day Honkala hired Van Camp. Van Camp received the letter, but not the attachment. The attachment contained the proposed permanent injunction that would have ended the litigation against Honkala. Van Camp did not inform Campbell of the missing attachment, although Campbell specifically requested a response to the settlement offer. Nor did he communicate the offer to Honkala, who, as discussed previously, desired quick resolution. Honkala testified he was surprised to hear of the settlement offer in July 2007, eight months after Campbell sent it. Campbell continued to seek settlement *609 throughout that period, and yet Van Camp never responded to those requests, in violation of his duty of diligent representation.
¶ 31 Van Camp argues that Honkala had already rejected a settlement before hiring Van Camp and that a lawyer is not required to communicate (or to even respond to) previously rejected offers. There is no evidence that Honkala rejected the offer; in fact, he sought counsel in order to better understand it. Van Camp additionally argues that he was in fact pursuing settlement, using a technique that had served him well in the past, pushing the case to mediation, and his technique just failed him in this instance. But Van Camp fails to explain why a conversation with Campbell in December 2006 was insufficient, and it was necessary to wait until July 2007 to mediate, when an offer was already on the table. We conclude a violation of RPC 1.3 has been established in this record.
Count 3
By failing to timely provide the client with copies of letters and settlement proposals, even after repeated requests, Respondent violated RPC 1.4(a).
¶ 32 A lawyer must, under RPC 1.4(a), inform the client of any circumstance requiring the client's consent, reasonably consult with the client regarding the means by which the client's objectives will be accomplished, keep the client reasonably informed about the status of the matter, and promptly comply with any requests for information. The Disciplinary Board's conclusion that Van Camp violated RPC 1.4(a) is supported in the record by the numerous requests sent by Honkala seeking status updates and copies of documents. Twice in March Honkala requested copies of the documents filed in his case and mentioned he had repeatedly asked for these and received nothing. Van Camp finally sent some copies in April, but it is unclear what was sent. In August, Honkala was still seeking a copy of the settlement offer and proposed permanent injunction.
¶ 33 Van Camp does not dispute this failure, but instead argues he was confused about what documents he had, which is why he did not provide Honkala with what he was seeking. Van Camp alleges his negligence in this regard did not harm Honkala, since the permanent injunction was similar to the preliminary one. But given Honkala's desire, even if conflicted, of quick settlement, this failure could have cost Honkala and his wife months of lawsuit-related stress and expense. Regardless, as to the violation itself, the RPCs do not inquire about harm. There is substantial evidence, including Van Camp's own admission, to show he violated RPC 1.4(a).
Count 4
By failing to explain clearly at the outset of representation how his fee would be calculated and/or how the client's $25,000 payment would be applied, Respondent violated RPC 1.4(b) and/or RPC 1.5(b).
¶ 34 The Disciplinary Board found Van Camp violated both RPC 1.4(b) and RCP 1.5(b). Under RPC 1.4(b), the lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Under RPC 1.5(b), the lawyer is required to explain the rate or basis of the fee and the lawyer's billing practices, and, if asked, must provide the client, in writing, the basis or rate of the fee.[7] The record establishes that Van Camp failed to communicate how the fee would be calculated and applied. Further, the Disciplinary Board found entering into the ambiguous fee agreement itself to be a violation. The agreement was ambiguous because it included both hourly and retainer-type fee arrangements, and it was devoid of any description of the scope of *610 representation. These conclusions are similarly supported by substantial evidence.
¶ 35 The hearing officer found that Honkala believed he was retaining Van Camp on an hourly basis, because hourly rates were discussed at the first meeting. We give considerable weight to her findings, especially with respect to the credibility of the witnesses. In re Disciplinary Proceeding Against Cramer, 165 Wash.2d 323, 332, 198 P.3d 485 (2008). Rather than dispute this, Van Camp argues that once it became clear Honkala was confused, in March, he communicated that it was a flat fee, so he complied with his ethical duty. This argument does not address RPC 1.4(b), in that Honkala needed sufficient information about the matter (including how the fee was being calculated) to make informed decisions concerning his case. Had Van Camp been clear that the $25,000 was a flat fee, Honkala might have sought a different attorney. Van Camp argues that his offer to arbitrate the fee should somehow excuse any violation. But, even if this were so, the offer was never communicated directly to Honkala. Van Camp suggested he would arbitrate the fee dispute to the WSBA, but then claimed he had earned well over $25,000 from the representation.
¶ 36 Van Camp additionally argues that the RPCs did not require a written fee agreement for flat fees at the time. While this is literally true, it does not excuse the confusing nature of his written fee agreementwhich Van Camp does not dispute. He agrees that a clearer fee agreement would have prevented Honkala's claims of misunderstanding now, continuing to imply that Honkala is misrepresenting himself to the WSBA. Even in those situations where no written fee agreement is required, in order to avoid confusion or later dispute, it is always wise to have one and, if a written fee agreement is used, it should be written in clear language that the client can understand. What is more, Van Camp knew that the phrase "earned retainer" was problematic based on his prior discipline, yet chose to retain that language, prompting this proceeding. We therefore find Van Camp violated both RPC 1.4(b) and RPC 1.5(b).
Count 5
By charging $25,000 under the facts of this case, Respondent violated RPC 1.5(a).
¶ 37 A lawyer's fee must be reasonable. RPC 1.5(a). The Disciplinary Board concluded Van Camp violated this by charging $25,000 under the facts of this case. Of particular note were reasonableness factors 1, 4, 7, and 9:(1) the time, labor, novelty, difficulty, and skill required; (4) the amount involved and results obtained; (7) experience, reputation, and ability of the lawyer; and (9) and the terms of the fee agreement, including whether the client received a reasonable and fair disclosure of material elements of the fee agreement and the lawyer's billing practices. This conclusion is amply supported by the record. Decision Papers at 000022.
¶ 38 As already mentioned, experts testified for both sides concerning the reasonableness of the fee. Van Camp's expert, Mark Roecks, who obtained his understanding about the nature of the case from Deissner (not through reviewing the case file or pleadings3 RP at 544), testified that a $25,000 flat fee would not be unreasonable to take the case to trial, at least at the inception of the agreement. He could not testify about the reasonableness of this in relation to the actual work done.
¶ 39 The WSBA's expert, Leslie Weatherhead, who had reviewed all the pleadings and the entire case file, testified without hesitation that the fee was excessive and unreasonable. Weatherhead's testimony raised questions about the quality of representation in relation to the results obtained (factor 4): for example, neither the TRO nor the preliminary injunction gave any legal basis for using the court's power to silence Honkala, and in Weatherhead's mind raised huge issues of prior restraint, yet, since it was not defended, is basically what Honkala had to settle with.[8] Weatherhead questioned Van Camp's *611 procrastination regarding discovery, because in his opinion a lawyer working on a flat fee would pursue discovery aggressively up front to demonstrate his seriousness about the case. He questioned the August 31, 2007, discovery preparation since any depositions would not be ready in time for a summary judgment filing on September 10, 2007, the cutoff for dispositive motions. Weatherhead reviewed the time reconstruction and questioned its accuracy. His testimony was extensive and comprehensive, and left little doubt that the fee here was unreasonable.
¶ 40 A review of Van Camp's reconstructed billing statements is extremely troubling and illustrates the unreasonableness of this fee. In describing his process, Barber, the paralegal tasked with the reconstruction, testified he went through the file page by page, building a timeline and accounting for any possible work that could have been done. For those tasks he was unfamiliar with, he simply guessed at the amount of time. His original estimates were in tenths of an hour, but Van Camp was unhappy with the resulting $8,000 to $10,000 fee and instructed Barber to use half-hour increments for attorney time. This change bumped the fee up to between $16,000 and $20,000, but Van Camp was "unhappy that the figure was low." 4 RP at 882. Barber advised Van Camp the only way to increase the amount was to show Van Camp had reviewed every document that came in, and Van Camp instructed Barber to do so. The actual response or review time was immaterial, since Barber used the half-hour increment for each, so "if it was a two-sentence letter or if it was a one-page letter, it didn't make any difference." Barber spent four or five days perfecting this time reconstruction, with a final total of over $33,000. But Barber testified that the first version, the $8,000 one, was the fairest estimation of time actually spent on Honkala's representation. 4 RP at 876-92.[9] Given this extensive evidence, we conclude Van Camp violated RPC 1.5(a).
Count 9
By misrepresenting in his July 31, 2007 letter to Honkala that Campbell had provided a proposed preliminary injunction with his December 15, 2006 letter, Respondent violated RPC 8.4(c).
¶ 41 It is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." RPC 8.4(c). The hearing officer concluded Van Camp violated this in a letter to Honkala when he misrepresented that the permanent injunction Honkala requested was actually the preliminary injunction Honkala had been served with and which was currently in place. This too is supported by the record.
¶ 42 By the time Campbell sent the fax, on December 15, 2006, Campbell had already filed the motion for the preliminary injunction and the hearing had been noted for a few days later. Campbell's letter sought to finally resolve the suit through a permanent injunction. By July 31, 2007, the preliminary injunction had been in place for eight months, and the parties had been to mediation, where the permanent injunction was referenced. Van Camp may not have possessed a copy of it, but this does not change the nature of the document itself. The hearing officer, who was the judge of Van Camp's credibility, found he knowingly withheld this document to prolong the case and justify his fee. We agree with the hearing officer and the Disciplinary Board, and find Van Camp violated RPC 8.4(c).

3. Is the recommended sanction of disbarment appropriate?
¶ 43 The Disciplinary Board recommended disbarment as the presumptive sanction for counts 4 and 5, those related to *612 the fee.[10] The hearing officer recommended two years' suspension. We give more weight to the Disciplinary Board's recommendation based on its unique experience and perspective in the administration of sanctions. Preszler, 169 Wash.2d at 19, 232 P.3d 1118 (citing In re Disciplinary Proceeding Against Cohen, 150 Wash.2d 744, 754, 82 P.3d 224 (2004)). We affirm the Disciplinary Board's recommendation unless we can articulate a specific reason to reject it. See In re Disciplinary Proceeding Against Marshall, 167 Wash.2d 51, 90, 217 P.3d 291 (2009). We use a three step process when reviewing the recommended sanction. We first consider the ethical duties violated, the lawyer's mental state, and the actual or potential injury caused by the conduct, using the ABA Standards. Second, we determine whether aggravating and mitigating circumstances call for a departure from the presumptive sanction. Third, if raised by the attorney being disciplined, we evaluate the proportionality of the sanction to the misconduct and the extent of agreement among the Disciplinary Board.
¶ 44 The total of Van Camp's ethical violations here is extremely serious. While we have already analyzed these violations, a few points merit further mention. First, Van Camp utilized a confusing fee agreement that he knew to be ambiguous.[11] The form used the phrase "earned retainer" when Van Camp argues he meant "flat fee." The agreement should have expressly established the basis for the fee. While retainer and flat fee agreements are ethically acceptable, RPC 1.5(f),[12] the terms must be clear, in language the client can readily understand, and must be contained in a writing signed by the client. The client must know and understand the agreement. Any ambiguities will most often be construed against the lawyer as the drafter. In this case, adding to the confusion on this form, Van Camp's fee agreement contains both the "earned retainer" phrase and listed hourly rates, which suggests that hourly rates may be charged against the "earned retainer" amount. Further, the agreement did not define the scope of the representation. It should have. And, taking us to our next point, the services agreed upon should actually be performed.
¶ 45 The only specification in the fee agreement was that Van Camp would represent and defend Honkala "in a suit." But Van Camp's various ethical violations demonstrate he fell far short of this and his general responsibility to represent his client. A lawyer must advise his client, advocate for his client's interest, and provide representation consistent with his client's needs. In this case, Van Camp did not communicate or explain a settlement offer to his client, despite numerous indications that his client wished to settle. He did not provide his client with diligent representation, for example, by failing to follow up with opposing counsel regarding settlement offers. He did not keep his client informed about his case. And Van Camp misled his client, telling Honkala there was no permanent injunction offer. This emerging pattern of dishonesty is very troubling.
¶ 46 Van Camp's reconstructed time sheets are further significant evidence of his ethical lapses. He does not dispute that this was an attempt to justify his fee. But it was not an *613 honest justification. The entirety of the reconstruction is questionable. For example, it lists 9.5 attorney hours for the first day of the representation, when Honkala initially met Van Camp. This is in addition to listing 27 attorney hours for e-mails from and to Honkala. (Worth noting, we disbarred a lawyer largely based on her misrepresentations and falsification of documents to the WSBA during the investigation process. In re Disciplinary Proceeding Against Whitt, 149 Wash.2d 707, 72 P.3d 173 (2003).) This falsification of the time sheets indicates that Van Camp knew he was violating the RPCs.
¶ 47 This brings us to an examination of the lawyer's mental state and the injury caused by the misconduct. Under the ABA Standards, suspension is appropriate if the lawyer knowingly engages in violative conduct and causes injury or potential injury to the client, the public, or the legal system. ABA Standards, std. 7.2. Disbarment, however, is appropriate when the lawyer knowingly engages in violative conduct with the intent to benefit himself or herself that causes serious or potentially serious injury to the client, the public, or the legal system. ABA Standards, std. 7.1 (differences emphasized).
¶ 48 The facts before us are sufficient to find the requisite mental state warranting disbarment. We give great weight to the hearing officer's factual findings regarding the lawyer's state of mind. Cramer, 165 Wash.2d at 332, 198 P.3d 485. The hearing officer found that Van Camp knowingly deceived his client with the ambiguous fee agreement and that the fee arrangement was drafted expressly and knowingly by Van Camp for his own benefit, so the knowledge and intent requirements were met. This is further evidenced by Van Camp's prior discipline, which put him on notice that his fee agreement was problematic, and by his dishonest time reconstruction.
¶ 49 The Disciplinary Board increased the sanction from the hearing officer's recommendation because it thought the injury to Honkala and the legal system was, in fact, serious. We agree. Importantly, the Disciplinary Board noted Van Camp withheld an early settlement offer that could have settled the litigation early and at minimal expense, and he refused to voluntarily refund any portion of the fee.[13] The WSBA argues the injury to Honkala was serious due to Honkala's financial situation. Honkala was unemployed because of a disability, had to get a loan to come up with the $25,000, and his family, which includes three children, supported itself mainly on his wife's incomeso $25,000 was a substantial amount of money to him. Additionally, Van Camp's failure to diligently represent his client likely cost Honkala any chance he had in prevailing against Wendle on his lost contract expectancy claim, as his counterclaim was included in the litigation that was dismissed with prejudice. Together, these warrant a finding of serious injury.
¶ 50 The extensive aggravating factors present give further support for disbarment. The hearing officer listed (1) prior discipline, (2) dishonest or selfish motive, (3) bad faith obstruction of the disciplinary process, (4) refusal to acknowledge wrongful nature of conduct, and (5) substantial experience in the practice of law as aggravators.[14] Additionally, the Disciplinary Board added a sixth factor: indifference to making restitution, after three years passed without Van Camp making any refund of fees. We consider these aggravators to be very serious. See In re Disciplinary Proceeding Against Cramer, 168 Wash.2d 220, 237-38, 225 P.3d 881 (2010) (aggravating factors of prior discipline, bad *614 faith obstruction of disciplinary process, substantial experience, and indifference to making restitution would justify disbarment even if not the presumptive sanction).
¶ 51 Of these aggravators, we are concerned with Van Camp's record of similar prior discipline. He has been disciplined three times in the last 25 years for violations similar to those here.
¶ 52 In 1985, Van Camp was censured for charging an excessive fee, engaging in conduct prejudicial to the administration of justice, making misrepresentations to the court and the WSBA, engaging in potential conflicts of interest by making loans to a client, and by having an ex parte hearing without notice to the other party. Restitution for the excessive fee was $29,000. Here, the hearing officer thought this violation too remote to have much bearing upon the present proceeding. The Disciplinary Board correctly disagreed, listing the excessive fee as an aggravator within its discussion of disbarment as a more appropriate sanction than suspension. We agree. We routinely consider misconduct dating back many years as an aggravating factor where the misconduct is similar. See, e.g., In re Disciplinary Proceeding Against VanDerbeek, 153 Wash.2d 64, 92, 101 P.3d 88, (2004).
¶ 53 In 2002, Van Camp was suspended for six months for making false statements, under penalty of perjury, in his bankruptcy proceeding. The hearing officer found this to be a poor reflection of Van Camp's record for truthfulness and honesty, and "indicative of a serious disregard for upholding the integrity of the legal system and the profession." Findings of Fact at 000027. We agree. This violation is somewhat similar to the current misrepresentations to his client, and one of Van Camp's current aggravating factors, bad faith obstruction of the disciplinary process, which involved false statements as well.
¶ 54 In 2005, Van Camp was reprimanded for violating former RPC 1.4(b) (1985) by using the term "earned retainer fee" on intake of a potential medical malpractice case. In that case, the agreement was unclear how $1,000 paid by the client would be used, whether for costs, fees, or both, and whether any of it was refundable should Van Camp not pursue the case. There was actual injury to the client because she was denied sufficient information to allow her to make an informed decision regarding Van Camp's representation, similar to the current situation. Finding the evidence close, the hearing officer gave him the benefit of the doubt as to mental state and selfish motive and concluded he was merely negligent. Ultimately, Van Camp was reprimanded and placed on a two year probation, but a review of the hearing officer's recommendation reveals she chose not to recommend suspension because Van Camp was then currently suspended, and she assumed it would run concurrently. There were two terms of the probation:
a. Respondent may not accept earned retainer fees as defined in Formal Opinion 186[[15]] in cases where he undertakes representation of personal injury victims, regardless of the cause of that injury, be it medical malpractice or otherwise. Respondent must treat all advance fee and/or cost payments as advance fee and/or costs payments, including maintaining them in his trust account until withdrawal is appropriate under [former] RPC 1.14 (i.e., the fee is earned and due to the lawyer, or the cost is incurred).
b. Respondent must purchase a stamp, which must be used on all documents, pleadings or correspondence received or produced by his office and sent to *615 clients, to evidence the fact that the document has been sent or mailed to the client....
Board Ex. 71.[16] The terms of the probation put Van Camp on notice to more adequately explain his fees and to provide clients with copies. Yet, the conduct in this case is largely the same.
¶ 55 The only aggravating factor Van Camp contests is the similarity of the 2005 discipline, attempting to distinguish his prior misconduct from the present. However, the language of the fee agreement that was found to be ambiguous was the same as used here. While some facts may differ in the present proceeding, what remains is that Van Camp did not learn from his prior discipline and correct the problem. We have disbarred attorneys for repeated behavior indicating the attorney did not learn from the previous disciplinary action. See In re Disciplinary Proceedings Against Yates, 110 Wash.2d 444, 453, 755 P.2d 770 (1988) (citing In re Disciplinary Proceedings Against Allper, 94 Wash.2d 456, 617 P.2d 982 (1980); In re Disciplinary Proceeding Against Vetter, 104 Wash.2d 779, 711 P.2d 284 (1985); In re Disciplinary Proceeding Against Selden, 107 Wash.2d 246, 728 P.2d 1036 (1986)).
¶ 56 Next, we consider the extent of agreement among the Disciplinary Board. "We give deference to the sanction decisions of a unanimous Disciplinary Board." Cramer, 165 Wash.2d at 331, 198 P.3d 485 (citing In re Disciplinary Proceeding Against Day, 162 Wash.2d 527, 538, 173 P.3d 915 (2007)). But here the Disciplinary Board was split: seven favored disbarment while three preferred a three year suspension. Van Camp argues a split Disciplinary Board decision vitiates the deference we give, but he cites no authority that supports this proposition. The consideration of a divided Disciplinary Board is merely one aspect of our analysis. One thing is clear: the Disciplinary Board was unanimous in imposing a serious sanction of at least a three year suspension. With this in mind, we consider proportionality.
¶ 57 In conducting this proportionality analysis, we focus on the misconduct, aggravating factors, prior discipline, and the lawyer's culpability to determine whether the sanction here is appropriate. See In re Disciplinary Proceeding Against Christopher, 153 Wash.2d 669, 686-87, 105 P.3d 976 (2005). The lawyer must show the recommended sanction disproportionate, Marshall, 160 Wash.2d at 349, 157 P.3d 859, and that the recommended "`sanction departs significantly from sanctions imposed in other cases.'" In re Disciplinary Proceeding Against Hicks, 166 Wash.2d 774, 790, 214 P.3d 897 (2009) (emphasis omitted) (quoting In re Disciplinary Proceeding Against Haley, 156 Wash.2d 324, 339, 126 P.3d 1262 (2006)).
¶ 58 None of the cases provided by Van Camp establish that disbarment would be disproportionate.[17] What they do suggest is *616 that had Van Camp's misconduct been less serious, or not involved six counts, or not involved such extensive aggravating factors, or not been coupled with prior discipline, then disbarment might be disproportionate. But the misconduct before us, when considered together in its entirety, does warrant disbarment, and disbarment is not disproportionate.

CONCLUSION
¶ 59 The six ethical violations found by the hearing officer and affirmed by the Disciplinary Board are supported by substantial evidence. Van Camp violated his duty to advise and inform his client, to abide by the client's objectives, to act with reasonable diligence, and to be honest with his client. He used a fee agreement he knew to be ambiguous, failed to explain the basis for his fees, and charged an unreasonable fee. He did this knowingly and intentionally for his own benefit. Numerous aggravating factors, including similar prior discipline and bad faith obstruction of the disciplinary process, support the sanction of disbarment. Therefore, we adopt the Disciplinary Board's recommendation and disbar Van Camp.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, DEBRA L. STEPHENS, and CHARLES K. WIGGINS, Justices.
NOTES
[1] These facts are mainly taken from the hearing officer's "Findings of Facts, Conclusions of Law and Hearing Officer's Recommendations", as adopted by the Disciplinary Board. While Van Camp assigned error to some of these findings, he did not argue the error in his briefs, so these facts are verities on appeal. In re Disciplinary Proceeding Against Marshall, 160 Wash.2d 317, 330-31, 157 P.3d 859 (2007) (citing cases).
[2] The complaint listed (1) misappropriation of trade secrets; (2) tortious interference with business relations; (3) civil libel, slander, and defamation; (4) a Consumer Protection Act violation; (5) and Lanham Act violations; it sought injunctive relief, affirmative acts by Honkala to protect Wendle's reputation, a money judgment, treble damages, costs, and attorney fees. Disciplinary Board (hereinafter Board Ex.) Ex. 1.
[3] One of Van Camp's employees finally contacted Campbell, seeking the permanent injunction and settlement offer on August 3, 2007.
[4] While Van Camp reviewed the package, he did not notice the alteration. The hearing officer found insufficient proof that Van Camp directed the employee to alter the letter, although Van Camp had stated that he didn't like the chocolates reference.
[5] ELC 10.13(d), titled "Witnesses," provides in pertinent part: "The parties have the right to cross-examine witnesses who testify and to submit rebuttal evidence."
[6] Van Camp argues he did in fact explain the injunction, accurately, in this way: "that agreeing to the injunction would essentially be giving up and `admitting you're ugly, too,'" but Honkala just didn't like that advice. Van Camp's Br. at 29.
[7] RPC 1.5(b) provides: "The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client. Upon the request of the client in any matter, the lawyer shall communicate to the client in writing the basis or rate of the fee."
[8] Weatherhead testified: "I do have the opinion that Judge Van Sickle would have seriously entertained, had serious doubts about the legitimacy of using the power of the Federal Courts to silence a consumer who was unhappy about a product that he bought or tried to buy.... Had the court been forced to seriously address the appropriateness of the Lanham Act as applied in that situation, there may well have been a serious question of subject matter jurisdiction.... If the preliminary injunction had been refused there's reason for optimism that he would not have settled on those terms." 4 RP at 833, 834, 840.
[9] For comparison purposes, it is worth noting that Campbell, Wendle's counsel, billed approximately $27,000, of which $3,000 to $6,000 was legal research, and the majority of billings were for work on the TRO and preliminary injunction. FF at 000020.
[10] With multiple instances of misconduct, the overall sanction should be consistent with the sanction for the most serious offense. Preszler, 169 Wash.2d at 18, 232 P.3d 1118.
[11] In 2005, Van Camp was disciplined for violating RPC 1.4(b) for using the ambiguous term "earned retainer." During that proceeding, actual injury to the clients was found based on this because the clients were denied sufficient information to allow them to make an informed decision regarding Van Camp's representation.
[12] A "retainer" is a fee paid by the client to ensure the lawyer is available to the client during a specified period or for a specified matter and may be separate from and in addition to any other fees paid for legal services actually performed. A "flat fee," on the other hand, constitutes complete payment for a lawyer's services. RPC 1.5(f)(2). Numerous requirements for both types are listed in the rule and comments, and if a lawyer does not follow these, any payment is considered an advance fee deposit against future services or costs and must be deposited in the lawyer's trust account. RPC 1.5(f) cmt. 12. Washington has diverged from the American Bar Association's, Model Rules of Professional Conduct regarding these types of fee arrangements. While RPC 1.5(f) was not in effect at the time of these violations, Van Camp was aware of and subject to this definition of "retainer" due to prior discipline, as will be discussed below.
[13] In an interesting analogy, the WSBA notes that the intentional deprivation of over $5,000 constitutes first degree theft, a class B felony. RCW 9A.56.030. The hearing officer ordered restitution of $15,000, three times that amount, which Van Camp refused to voluntarily repay. At oral argument in front of the Disciplinary Board, Van Camp's counsel explained the withholding was due to Van Camp's belief that fee arbitration, not a disciplinary action, was the appropriate forum to determine the fee dispute. Van Camp has now paid Honkala $15,000, but this was not part of the record before the hearing officer or the Disciplinary Board.
[14] The hearing officer considered Van Camp's reputation as a successful plaintiff's personal injury attorney as a potential mitigating factor, but this reputation did nothing to aid Honkala and is insufficient to overcome the extensive aggravating factors.
[15] Formal Opinion 186, which has since been withdrawn, discussed the difference between "advance fee deposits" and "retainers." Retainers secure a lawyer's availability, are considered earned at the time of payment, and are nonrefundable regardless of whether the lawyer performs any servicesprovided the client agrees to such an arrangement. The important point was that the client understood and agreed, and a written fee agreement that could be easily referenced in case of questions was recommended. Wash. State Bar Ass'n, Resources 450 (2002-2003). Formal Opinion 186 was withdrawn December 9, 2005, following our opinion in In re Disciplinary Proceeding Against DeRuiz, 152 Wash.2d 558, 99 P.3d 881 (2004), and the subsequent void in guidance regarding retainers was filled with RPC 1.5(f), effective November 18, 2008.
[16] Van Camp was suspended in 2002 following the misrepresentations in the bankruptcy proceeding, and it was still 2002 when the charges were brought regarding this third disciplinary matter. Board Ex. 73. We denied Van Camp's petition for discretionary review regarding the third matter on January 6, 2005. The WSBA charged Van Camp with violating the terms of his probation in this current proceeding, but the hearing officer found this charge unproved because the majority of violations here occurred after January 6, 2007.
[17] See Hicks, 166 Wash.2d at 784-93, 214 P.3d 897 (two year suspension for trust account violations and false statements to client and WSBA with similar aggravators, but no prior discipline); In re Disciplinary Proceeding Against Botimer, 166 Wash.2d 759, 773-74, 214 P.3d 133 (2009) (six month suspension for failure to obtain consent for conflicts of interest and improper disclosure of client confidences); Cramer, 165 Wash.2d at 340, 198 P.3d 485 (eight month suspension for knowingly placing client funds in general account when no harm resulted); In re Disciplinary Proceeding Against Trejo, 163 Wash.2d 701, 185 P.3d 1160 (2008) (three month suspension for trust account violations coupled with prior discipline); In re Disciplinary Proceeding Against Holcomb, 162 Wash.2d 563, 173 P.3d 898 (2007) (six month suspension for inappropriate financial dealings with client, no prior discipline); In re Disciplinary Proceeding Against Poole, 156 Wash.2d 196, 125 P.3d 954 (2006) (six month suspension for failure to provide accounting and one misrepresentation with similar aggravators, but no prior discipline); DeRuiz, 152 Wash.2d 558, 99 P.3d 881 (12 month suspension for similar violations and aggravators, but no prior discipline); In re Disciplinary Proceeding Against Plumb, 126 Wash.2d 334, 892 P.2d 739 (1995) (three year suspension for first degree theft, no prior discipline).